# No. 24-1248

In The

# United States Court of Appeals

## For The First Circuit

────────►►◄◄────────

KAREN MORALES POSADA, individually and on behalf of all others similarly situated; AMANDA SARMENTO FERREIRA GUIMARAES, individually and on behalf of all others similarly situated; WILLIANA ROCHA, individually and on behalf of all others similarly situated; SARA BARRIENTOS, individually and on behalf of all others similarly situated,

Plaintiffs - Appellees,

v.

CULTURAL CARE, INC., a Massachusetts Corporation,

Defendant - Appellant.

*On Appeal from the United States District Court for the District of Massachusetts Hon. Indira Talwani, District Judge, Case No. 1:20-cv-11862-IT*

## BRIEF FOR APPELLANT

HARVEY J. WOLKOFF
ALIKI SOFIS
ALEXANDER S. DEL NIDO
ALEX H. LOOMIS
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
111 Huntington Avenue, Suite 520
Boston, MA 02199
(617) 712-7100

WILLIAM B. ADAMS
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000

*Counsel for Defendant-Appellant*

May 17, 2024

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Fed. R. App. P. 26.1(a), Defendant-Appellant Cultural Care, Inc. states that it is a wholly-owned subsidiary of Cultural Care Management, Inc., a privately-held Delaware corporation.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ...................................................................iv

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD...........................xi

PRELIMINARY STATEMENT ...........................................................1

JURISDICTIONAL STATEMENT .....................................................3

STATEMENT OF THE ISSUES...........................................................4

STATEMENT OF THE CASE................................................................4

    A.    The Au Pair Program.........................................................4

    B.    The Arbitration Agreement ...............................................5

    C.    Procedural History...........................................................6

    D.    The District Court's Order Denying Cultural Care's Motion To Compel Arbitration.........................................................9

SUMMARY OF ARGUMENT .........................................................11

STANDARD OF REVIEW ...............................................................14

ARGUMENT ...................................................................................14

I.    THE DISTRICT COURT ERRED IN RULING THAT PLAINTIFFS' CLAIMS ARE NOT ARBITRABLE..................................................16

    A.    The Parties Clearly And Unmistakably Delegated All Aspects Of Arbitrability To The Arbitral Tribunal .........................16

    B.    In The Alternative, This Court Should Hold That Plaintiffs' Claims Are Arbitrable .....................................................24

        1.    Cultural Care Is Entitled To Invoke The Arbitration Provision ...............................................................25

            (a)    Cultural Care Is A Third-Party Beneficiary Of The Agreement.................................................26

            (b)    Plaintiffs Are Equitably Estopped From Avoiding Arbitration Against Cultural Care .................33

        2.    Plaintiffs' Claims Are Within The Arbitration Provision's Scope...........................................................37

II.  THE DISTRICT COURT ERRED IN RULING THAT CULTURAL
     CARE WAIVED THE RIGHT TO ARBITRATE .......................................43

     A.  Cultural Care Did Not Intentionally Relinquish Its Right To
         Arbitrate..............................................................................................43

     B.  Cultural Care's Litigation Conduct Was Not Inconsistent With
         Its Right To Arbitrate .........................................................................48

CONCLUSION ...................................................................................................53

CERTIFICATE OF COMPLIANCE WITH RULE 32(g) ....................................55

CERTIFICATE OF SERVICE ..............................................................................56

ADDENDUM .......................................................................................................57

# TABLE OF AUTHORITIES

## Cases

*Al Rushaid v. Nat'l Oilwell Varco, Inc.*,
757 F.3d 416 (5th Cir. 2014) ............................................................39

*Allen v. Katz Agency, Inc. Emp. Stock Ownership Plan*,
677 F.2d 193 (2d Cir. 1982) ..............................................................29

*Apollo Computer, Inc. v. Berg*,
886 F.2d 469 (1st Cir. 1989)........................ 2, 11, 16, 17, 18, 19, 20, 22, 23, 24

*Arthur Andersen LLP v. Carlisle*,
556 U.S. 624 (2009)...........................................................................26

*ASSE Int'l, Inc. v. Kerry*,
803 F.3d 1059 (9th Cir. 2015) .............................................................4

*Awuah v. Coverall N.A.*,
554 F.3d 7 (1st Cir. 2009).................................2, 11, 18, 22, 23, 24

*B & R Supermarket, Inc. v. Visa Inc.*,
2021 WL 4408167 (E.D.N.Y. Sept. 27, 2021) ...................................52

*Becker v. Delek US Energy, Inc.*,
39 F.4th 351 (6th Cir. 2022) ..............................................................16

*Bossé v. N.Y. Life Ins. Co.*,
992 F.3d 20 (1st Cir. 2021)........................... 2, 11, 14, 16, 17, 20, 21, 22, 23, 24

*Brennan v. Opus Bank*,
796 F.3d 1125 (9th Cir. 2015) ...........................................................22

*Buruk v. Experian Info. Sols., Inc.*,
2024 WL 2025747 (D. Mass. May 6, 2024).......................................46

*Carpenter v. Pomerantz*,
36 Mass. App. Ct. 627, 634 N.E.2d 587 (1994) ................................40

*Chatham Shipping Co. v. Fertex S. S. Corp.*,
352 F.2d 291 (2d Cir. 1965) ..............................................................49

*Claudio-De Leon v. Sistema Universitario Ana G. Mendez*,
775 F.3d 41 (1st Cir. 2014)...........................................................49, 50

iv

*Creative Solutions Grp. v. Pentzer Corp.*,
252 F.3d 28 (1st Cir. 2001) ................................................................. 3, 44, 48, 49

*DiCarlo v. MoneyLion, Inc.*,
988 F.3d 1148 (9th Cir. 2021) ........................................................... 23

*Dish Network L.L.C. v. Ray*,
900 F.3d 1240 (10th Cir. 2018) ........................................................ 18, 19

*Donelson v. Ameriprise Fin. Servs., Inc.*,
999 F.3d 1080 (8th Cir. 2021) .......................................................... 52

*Epic Sys. Corp. v. Lewis*,
584 U.S. 497 (2018) ........................................................................... 38

*Forby v. One Technologies, L.P.*,
909 F.3d 780 (5th Cir. 2018) ............................................................ 49, 50

*FPE Found. v. Cohen*,
801 F.3d 25 (1st Cir. 2015) .............................................................. 43, 44, 45, 46

*Franklin v. Cmty. Reg'l Med. Ctr.*,
998 F.3d 867 (9th Cir. 2021) ............................................................ 36

*GE Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*,
590 U.S. 432 (2020) ........................................................................... 25

*Germany v. River Terminal Ry.*,
477 F.2d 546 (6th Cir. 1973) ............................................................ 51

*Gibson v. City of Cranston*,
37 F.3d 731 (1st Cir. 1994) .............................................................. 23

*Grand Wireless, Inc. v. Verizon Wireless, Inc.*,
748 F.3d 1 (1st Cir. 2014) ................................................................ 25, 26, 28

*Granite Rock Co. v. Teamsters*,
561 U.S. 287 (2010) ........................................................................... 39

*Green Enters., LLC v. Hiscox Syndicates Ltd. at Lloyd's of London*,
68 F.4th 662 (1st Cir. 2023) ............................................................. 14

*Gutierrez v. Wells Fargo Bank, NA*,
  889 F.3d 1230 (11th Cir. 2018) ........................................................52

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
  586 U.S. 63 (2019)........................................................16

*Hilti, Inc. v. Oldach*,
  392 F.2d 368 (1st Cir. 1968)........................................................3, 48, 49

*Hogan v. SPAR Group*,
  914 F.3d 34 (1st Cir. 2019)........................................30, 37, 41, 42, 43

*IAC/InterActiveCorp v. Roston*,
  44 F.4th 635 (7th Cir. 2022) ........................................................31

*Illinois v. Lidster*,
  540 U.S. 419 (2004)........................................................32

*InterGen N.V. v. Grina*,
  344 F.3d 134 (1st Cir. 2003)........................................................24, 29, 30

*Johnson v. Zerbst*,
  304 U.S. 458 (1938)........................................................44

*Kindred Nursing Centers Ltd. v. Clark*,
  581 U.S. 246 (2017)........................................................23

*Kudlacz v. Cultural Care, Inc.*,
  No. CGC-20-584567 (Cal. Super. Ct. Aug. 2, 2023) ........................................35

*Landry v. Transworld Systems*,
  485 Mass. 334, 149 N.E.3d 781 (2020)........................................................32

*Ledee v. Ceramiche Ragno*,
  684 F.2d 184 (1st Cir. 1982)........................................................14, 15, 24

*Machado v. System4 LLC*,
  471 Mass. 204, 28 N.E.3d 401 (2015)........................................................36

*Marie v. Allied Home Mortg. Corp.*,
  402 F.3d 1 (1st Cir. 2005)........................................................14, 51

*McCarthy v. Azure*,
  22 F.3d 351 (1st Cir. 1994)........................................................27, 29

*In re McGraw-Hill Glob. Educ. Holdings LLC*,
909 F.3d 48 (3d Cir. 2018) ...................................................31

*Med. Air Tech. Corp. v. Marwan Inv., Inc.*,
303 F.3d 11 (1st Cir. 2002) ..................................................31

*Medtronic AVE Inc. v. Cordis Corp.*,
100 F. App'x 865 (3d Cir. 2004) ..........................................40

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
473 U.S. 614 (1985) .............................................................38

*Morales Posada v. Cultural Care, Inc.*,
66 F.4th 348 (1st Cir. 2023) ......................................8, 45, 50

*Morgan v. Sundance, Inc.*,
596 U.S. 411 (2022) ..................................................38, 44, 46

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
460 U.S. 1 (1983) ................................................................37

*Muskat v. United States*,
554 F.3d 183 (1st Cir. 2009) ..............................................38

*In re Oak Knoll Assocs., L.P.*,
835 F.3d 24 (1st Cir. 2016) .................................................39

*OneBeacon Ins. Co. v. Georgia-Pac. Corp.*,
474 F.3d 6 (1st Cir. 2007) ...................................................26

*Oracle Am., Inc. v. Myriad Grp. A.G.*,
724 F.3d 1069 (9th Cir. 2013) .......................................18, 19

*Ouadani v. TF Final Mile LLC*,
876 F.3d 31 (1st Cir. 2017) .................................................31

*Parm v. Bluestem Brands, Inc.*,
898 F.3d 869 (8th Cir. 2018) ..............................................40

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*,
388 U.S. 395 (1967) .............................................................38

*Rae v. Air-Speed, Inc.*,
386 Mass. 187, 435 N.E.2d 628 (1982) ................................27

*Restoration Pres. Masonry, Inc. v. Grove Eur. Ltd.*,
    325 F.3d 54 (1st Cir. 2003)............................................................44, 47

*Ribadeneira v. New Balance Athletics, Inc.*,
    65 F.4th 1 (1st Cir. 2023).......................... 24, 25, 31, 36, 37, 38, 40, 43

*Riley Manufacturing Co. v. Anchor Glass Container Corp.*,
    157 F.3d 775 (10th Cir. 1998) ...................................................................19

*ROHM Semiconductor USA, LLC v. MaxPower Semiconductor, Inc.*,
    17 F.4th 1377 (Fed. Cir. 2021) ................................................................21

*Scherk v. Alberto-Culver Co.*,
    417 U.S. 506 (1974)..................................................................18, 30, 31

*Sharif v. Wellness Int'l Network, Ltd.*,
    376 F.3d 720 (7th Cir. 2004) ..................................................................49

*Sourcing Unlimited, Inc. v. Asimco Int'l, Inc.*,
    526 F.3d 38 (1st Cir. 2008)..................................................................33, 42

*Thyssen, Inc. v. Calypso Shipping Corp., S.A.*,
    310 F.3d 102 (2d Cir. 2002) ..................................................................45

*Turkiye Halk Bankasi A.S. v. United States*,
    598 U.S. 264 (2023)..................................................................................32

*United States v. Olano*,
    507 U.S. 725 (1993)..............................................................................43, 47

*Viking River Cruises, Inc. v. Moriana*,
    596 U.S. 639 (2022)..........................................................................18, 32, 39

*Williams v. Cigna Fin. Advisors, Inc.*,
    56 F.3d 656 (5th Cir. 1995) ..................................................................48

*Yavuz v. 61 MM, Ltd.*,
    576 F.3d 1166 (10th Cir. 2009) ............................................................49

## **Statutes**

9 U.S.C. § 16(a)(1)(C) ....................................................................3

9 U.S.C. § 202 ........................................................................9, 14

9 U.S.C. § 203 ................................................................................3

22 U.S.C. § 2451 ............................................................................4

28 U.S.C. § 1331 ............................................................................3

28 U.S.C. § 1332(d)(2) ...................................................................3

29 U.S.C. § 216(b) .........................................................................7

## Treaties

Convention on the Recognition and Enforcement of Foreign Arbitral
    Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3 .......................9, 14, 15

## Regulations

22 C.F.R. § 62.4 ............................................................................5

22 C.F.R. § 62.31(a) ......................................................................4

22 C.F.R. § 62.31(c) ......................................................................5

22 C.F.R. § 62.31(d) ......................................................................5

22 C.F.R. § 62.31(d)(2) ................................................................24

22 C.F.R. § 62.31(d)(3) ................................................................24

22 C.F.R. § 62.31(f) .......................................................................5

22 C.F.R. § 62.31(g) ......................................................................5

## Other Authorities

Int'l Chamber of Commerce, 2021 Arbitration Rules art. 1(3) ...............20

Int'l Chamber of Commerce, 2021 Arbitration Rules art. 6(3) ...............19

Restatement (Third) U.S. Law of Int'l Comm. Arb. § 2.3 (2023)............29

Swiss Rules of Int'l Arbitration art. 1(3) ...............................................20

Swiss Rules of Int'l Arbitration art. 23(1) .............................................19

United Nations Commission on Int'l Trade L.,
    "Status: Convention on the Recognition and Enforcement of
    Foreign Arbitral Awards (New York, 1958),"
    https://tinyurl.com/2s4xywxp (last visited Apr. 30, 2024)..................................15

**<u>REASONS WHY ORAL ARGUMENT SHOULD BE HEARD</u>**

Defendant-Appellant Cultural Care, Inc. respectfully requests oral argument in this appeal because the case involves important issues regarding the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* (the "FAA"), and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3 (the "New York Convention").

# PRELIMINARY STATEMENT

Plaintiffs-Appellees ("Plaintiffs") are former au pairs who participated in a U.S. State Department cultural exchange program sponsored by Defendant-Appellant Cultural Care, Inc. ("Cultural Care"). They, like all prospective au pairs, signed a contract with Cultural Care's Swiss affiliate, International Care Limited ("ICL"), in which they agreed to abide by the Cultural Care au pair program rules and to release Cultural Care from all liability. They also agreed that any claims "arising out of" their "relationship" with ICL would be subject to arbitration.

Plaintiffs have now sued Cultural Care for allegedly failing to pay them adequate wages, on the theory that Cultural Care's obligations under the au pair program, as spelled out in their contract with ICL, make Cultural Care their "employer" under state and federal wage-and-hour laws. In pressing these allegations, Plaintiffs treat ICL and Cultural Care as interchangeable and the terms of their ICL contract as a basis for Cultural Care's liability. Yet Plaintiffs have refused to submit their claims to arbitration, as their contract requires. Cultural Care, accordingly, moved to compel arbitration.

The U.S. District Court for the District of Massachusetts (Talwani, J.) denied Cultural Care's motion, ruling that Plaintiffs' claims against Cultural Care are not subject to arbitration and that Cultural Care waived its right to arbitrate. Both rulings were error under controlling decisions of the Supreme Court and this Court.

*First*, the district court erred in ruling that Plaintiffs' claims are not arbitrable. Plaintiffs agreed to arbitrate under arbitral rules that delegate arbitrability questions to the arbitrator. This Court has repeatedly held that, in such circumstances, the district court may not determine whether a dispute is arbitrable but must instead allow the arbitrator to decide whether it has jurisdiction. *See Bossé v. N.Y. Life Ins. Co.*, 992 F.3d 20, 27-28 (1st Cir. 2021); *Awuah v. Coverall N.A.*, 554 F.3d 7, 11-12 (1st Cir. 2009); *Apollo Computer, Inc. v. Berg*, 886 F.2d 469, 472-73 (1st Cir. 1989). The district court did not even acknowledge this Court's precedents.

Even if there were no delegation of this threshold arbitrability issue (and there was), the district court still erred in its arbitrability analysis. The arbitration provision covers two types of disputes: (1) disputes arising out of Plaintiffs' relationship with ICL and (2) any disputes between Plaintiffs and ICL. Plaintiffs never disputed that their claims fall within clause (1). The court construed clause (1) to be limited to disputes between ICL and Plaintiffs, even though this would make clause (1) redundant with clause (2). It then further erred in ruling that, regardless of the clause's scope, Cultural Care was not entitled to enforce the arbitration provision. The court did not disagree that Cultural Care was a third-party beneficiary of *the contract* but applied the wrong legal test, ruling that Cultural Care could not compel arbitration because it was not an intended beneficiary of *the arbitration provision itself*. Cultural Care can also enforce the arbitration provision

as a matter of equitable estoppel because Plaintiffs' complaint treats ICL and Cultural Care as a single corporate entity, and their wage-and-hour allegations turn on Cultural Care's responsibilities outlined in Plaintiffs' contract with ICL.

*Second*, the district court erred in ruling that Cultural Care clearly waived the right to arbitrate through its litigation conduct. "Waiver" is an intentional relinquishment of a known legal right, and Cultural Care did no such thing. This Court has long held that a party can move to dismiss a case before moving to compel arbitration, so long as the party asserts arbitration as a defense in its answer. *See, e.g.*, *Creative Solutions Grp. v. Pentzer Corp.*, 252 F.3d 28, 32-33 (1st Cir. 2001); *Hilti, Inc. v. Oldach*, 392 F.2d 368, 371 (1st Cir. 1968). Cultural Care's only other action in the district court was to seek to prevent new plaintiffs from opting into the lawsuit, which other courts have uniformly ruled is not inconsistent with the right to arbitrate. In nevertheless deeming Cultural Care to have waived its arbitration rights, the district court erroneously treated waiver not as the relinquishment of a contractual right but as a penalty for failing to raise its arbitral rights sooner.

For all these reasons, this Court should reverse the order below.

## JURISDICTIONAL STATEMENT

The district court has subject matter jurisdiction under 9 U.S.C. § 203 and 28 U.S.C. §§ 1331, 1332(d)(2). This Court has appellate jurisdiction under 9 U.S.C. § 16(a)(1)(C).

## STATEMENT OF THE ISSUES

1.     Whether the district court erred in ruling that Plaintiffs' claims are not arbitrable.

2.     Whether the district court erred in ruling that Cultural Care intentionally waived the right to arbitrate.

## STATEMENT OF THE CASE

### A.     The Au Pair Program

The Fulbright-Hays Act of 1961 authorizes the State Department to establish international exchange visitor programs to "assist in the development of friendly, sympathetic, and peaceful relations between the United States and the other countries of the world." 22 U.S.C. § 2451. Pursuant to this statute, the State Department created the au pair exchange program, under which "foreign nationals are afforded the opportunity to live with an American host family," "attend a U.S. post-secondary educational institution," and "provide up to forty-five hours of child care services per week." 22 C.F.R. § 62.31(a).

For the au pair program, the State Department "uses third-party program sponsors to select qualifying visitors, find them educational or training opportunities, and monitor their welfare during their programs," *ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059, 1064 (9th Cir. 2015). *See* A266. Sponsors must screen, select, and certify all foreign participants as eligible for each exchange program, provide program

orientations and training for au pairs, and employ local representatives to monitor the au pairs' welfare. 22 C.F.R. §§ 62.4, 62.31(c)-(d), 62.31(f)-(g).

Cultural Care is a sponsor of the State Department au pair program, and it works with its Swiss affiliate, ICL (which does business under the name "Cultural Care") to perform some of its responsibilities as sponsor. A266-67; Add.19. ICL performs the "identification, screening, and preparation of prospective au pairs," as required by State Department regulations. A267. "Once the au pairs arrive in the United States, [Cultural Care] is responsible for the au pair training" required by the State Department, "monitoring au pair wellbeing, and monitoring host-family and au pair compliance with [State Department] regulations." A267.

## B.    The Arbitration Agreement

To ensure their compliance with State Department regulations, ICL and Cultural Care have all prospective au pairs sign a contract with ICL concerning "the au pair's participation in Cultural Care Au Pair au pair program (the 'Program')." Add.19. (The references to "Cultural Care" in this contract technically refer to ICL.).

Pursuant to this contract, au pairs "submit" materials to ICL, Add.19 (¶2), which ICL uses to "screen[] prospective au pairs before [Cultural Care] facilitates the matching process," A267; ICL "choos[es] appropriate host families," Add.19 (¶8); and au pairs agree that ICL and Cultural Care have "the exclusive right to determine [their] suitability for acceptance and for [their] continued participation in

the Program," including the right to remove au pairs from the Program or place them with new host families for numerous reasons. Add.20 (¶10); *see* Add.19 (¶¶4-5, 9). Au pairs also agree to undertake "child care responsibilities," Add.19 (¶4).

Finally, au pairs agree to "release and forever discharge [ICL] and its affiliates ... ( ... 'Released Parties'), from any and all claims ... which arise out of ... injury, damage or loss of any other kind ... resulting from or during participation in the Program," and "to indemnify and hold harmless the Released Parties from and against any losses, claims, damages or liabilities related to or arising out of [their] participation in the Program." Add.20 (¶14).

This contract, which is just two pages long, is governed by Swiss law. Add.20 (¶15). It contains an arbitration provision, which provides:

> In the event of any claim, dispute, or proceeding arising out of the relationship of me and [ICL], or any claim which in contract, tort, or otherwise at law or in equity arises between the parties, whether or not related to this Agreement, the parties submit and consent to the exclusive jurisdiction and venue of the arbitrational tribunals of Switzerland.

Add.20 (¶15).

## C. Procedural History

Plaintiffs are former au pairs, all of whom signed the above arbitration agreements. A270-81; *see* Add.19-20. They allege violations of state and federal wage-and-hour laws and that Cultural Care is liable for those violations as their "employer." A54-55. Plaintiffs contend that Cultural Care is their employer because

6

it allegedly had discretion whether to allow them to participate in the au pair program, whether to end their participation in the program, and exercised substantial control over them. A56-58. This control allegedly included: "[r]equir[ing] that the au pair's schedule be limited to 45 hours per week, with a maximum of 10 hours per day"; "[d]ictat[ing] that the au pair will perform childcare services"; keeping "records of meetings with Cultural Care's regional points of contact"; and "requir[ing] all its au pairs to attend four days of training prior to traveling to their host family." A57-58. Plaintiffs' complaint does not mention ICL, but implicitly attributes all of ICL's conduct to Cultural Care.

After several agreed-upon extensions and stays of discovery, A28, A34, A50-51, Cultural Care moved under Rule 12(b)(1) and Rule 12(b)(6) to dismiss Plaintiffs' operative complaint a month after it was filed. Cultural Care contended that the district court lacked subject matter jurisdiction because it was running the au pair program on the State Department's behalf, and thus possessed derivative sovereign immunity from suit. A99. Cultural Care also argued that Plaintiffs failed to state a cause of action because they had not plausibly alleged that Cultural Care was an "employer" under federal and state wage-and-hour laws, and because Plaintiffs' claims were preempted by the au pair regulations. A99.

Two months later, Plaintiffs moved to conditionally certify a class of "similarly situated" employees under the FLSA, 29 U.S.C. § 216(b). While that

motion was pending, Plaintiffs' counsel also filed various "consents-to-sue" from au pairs who purportedly wished to opt in to the (not yet certified) class. *E.g.*, A5 (ECF Nos. 32-40). Cultural Care opposed conditional class certification and moved to strike Plaintiffs' consents-to-sue as premature. A102-42.

The district court denied Cultural Care's motion to dismiss in August 2021, and Cultural Care filed an interlocutory appeal under the collateral order doctrine. A11 (ECF 142), A143-64. Because the notice of appeal divested the district court of jurisdiction, the district court, with the parties' consent, stayed the case pending resolution of the appeal. A165-67, A173.

In April 2023, after requesting supplemental briefing from the United States and the parties, this Court affirmed the district court's order, albeit on different grounds. *See Morales Posada v. Cultural Care, Inc.*, 66 F.4th 348, 350 (1st Cir. 2023). On June 9, 2023, this Court's mandate issued. A16 (ECF 260).

On June 20, the district court issued an order denying Cultural Care's motion to strike the consents-to-sue and granting Plaintiffs' motion for conditional certification. A174-96.

On June 30, Cultural Care's counsel informed Plaintiffs' counsel that it would move to compel arbitration under Plaintiffs' contract with ICL if Plaintiffs declined to consent to arbitration; Plaintiffs refused. A283. The parties proposed a joint scheduling order staying discovery pending resolution of Cultural Care's motion to

compel arbitration.  A201-04.  Cultural Care also filed its answer to Plaintiffs' complaint, in which it preserved its arbitration defense in the introduction and its affirmative defenses.  A207, A238.

The parties held their Rule 16 conference just over a week later.  The court opened the conference by asking, unprompted by Plaintiffs, "Why isn't a motion to compel arbitration waived at this point?"  A248.

The court thereafter entered the parties' briefing schedule and stayed discovery.  A260-62.  Cultural Care promptly moved to compel arbitration under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3 (the "New York Convention") and Chapter II of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 202.

## D.     The District Court's Order Denying Cultural Care's Motion To Compel Arbitration

In February 2024, the district court denied Cultural Care's motion to compel arbitration.  Add.1-18.

The district court first ruled that Cultural Care waived its right to compel arbitration.  Add.11-12.  This was so, the court concluded, because Cultural Care "'substantially invoked' the litigation machinery" by bringing "a Motion to Dismiss," bringing "an interlocutory appeal" from the district court's denial of that motion, opposing Plaintiffs' motion for conditional class certification, and moving to strike pre-certification consents-to-sue, without averting to its arbitration defense.

9

Add.11.  The court concluded that making these filings without referencing the arbitration defense amounted to an intentional waiver of the right to arbitrate because "[b]oth sides—and two courts—have expended time and resources addressing arguments brought by Cultural Care Inc. on numerous aspects of this case," and Cultural Care did not avail itself of "ample opportunit[ies] to raise an arbitration defense."  Add.12.

The court proceeded to rule that, regardless of waiver, Plaintiffs' claims are not arbitrable.  It rejected Cultural Care's argument that the arbitration agreement delegated such questions to the arbitral tribunal.  Add.12-13.  "The arbitration clause makes no mention of the arbitrator resolving disputes about whether an entity is itself a party for the purposes of enforcement:  It necessarily follows that the provision is only triggered once the court determines that these parties have agreed to arbitration."  Add.13.

The court then ruled that Cultural Care could not enforce the arbitration provision because it was a "nonsignatory" to the arbitration agreement and had failed to show that it was entitled to compel arbitration.  Add.14-18.  The court concluded that Cultural Care was not entitled to invoke the arbitration provision as a third-party beneficiary of the *contract* because the *arbitration provision* did not refer to Cultural Care.  Add.15.  Cultural Care could not enforce the arbitration provision as a matter of equitable estoppel either because, according to the court, "[t]he actions Plaintiffs

allege established Cultural Care Inc. as their employer—and that serve as the crux of their claims—are not covered by the International Care Contract." Add.16-17.

The district court accordingly denied Cultural Care's motion to compel arbitration. Add.18. Cultural Care timely appealed. A654.

## SUMMARY OF ARGUMENT

I.      The district court erred in ruling that Plaintiffs' claims are not arbitrable, for two independent reasons.

*First*, the parties clearly and unmistakably delegated arbitrability questions, such as the arbitration provision's scope and who may enforce the provision, to the arbitral tribunal. The arbitration provision states: "[T]he parties submit and consent to the exclusive jurisdiction and venue of the arbitrational tribunals of Switzerland." Add.20. There are only two "arbitrational tribunals" in Switzerland capable of hearing general commercial disputes like this one. The rules for both tribunals expressly reserve to the arbitrator the power to rule on any objections to their jurisdiction. Agreeing to such rules constitutes an enforceable delegation of arbitrability to the arbitrator, including arguments that the nonsignatory movant could not seek to compel arbitration. *See Bossé*, 992 F.3d at 27-28; *Awuah*, 554 F.3d at 11-12; *Berg*, 886 F.2d at 472-73.

*Second*, in the alternative, this Court should hold that Plaintiffs' claims are arbitrable because Cultural Care is entitled to enforce the arbitration provision and Plaintiffs' claims are within the provision's scope.

Cultural Care is entitled to enforce the arbitration provision because it is a third-party beneficiary of Plaintiffs' contract with ICL, which requires Plaintiffs to abide by Cultural Care's rules and regulations governing its au pair program. Paragraph 14 of the contract also releases Cultural Care from all liability arising from Plaintiffs' participation in the au pair program. The district court did not dispute that Cultural Care was an intended beneficiary *of the contract*. But it ruled that Cultural Care could not invoke the arbitration provision's protections unless Cultural Care were an intended beneficiary of *the arbitration provision itself*. This ruling disregards this Court's precedent and discriminates against arbitration in violation of the FAA.

Cultural Care is also entitled to enforce the arbitration provision under equitable estoppel principles because Plaintiffs' complaint relies on their contract with ICL to bring claims against Cultural Care and treats ICL and Cultural Care as the same corporate entity.

Additionally, Plaintiffs' claims are within the arbitration provision's scope. That provision covers *both* (1) "any claim, dispute, or proceeding arising out of [Plaintiffs'] relationship with" ICL and (2) "any claim ... between the parties,

whether or not related to this Agreement." Add.19. Because clause (2) covers all disputes between ICL and Plaintiffs "whether or not related to the" contract, clause (1) must *necessarily* extend to Plaintiffs' claims against third parties. Plaintiffs never disputed below that their claims against Cultural Care fall within clause (1). The district court wrongly ruled that the arbitration provision covered only disputes between Plaintiffs and ICL, rendering clauses (1) and (2) of the arbitration provision redundant.

**II.** The district court erred in ruling that Cultural Care intended to waive its arbitration rights. None of Cultural Care's litigation conduct—moving to dismiss and filing short, threshold filings resisting preliminary class certification—is inconsistent with an intent to arbitrate. Cultural Care also filed an interlocutory appeal of the district court's denial of its motion to dismiss on subject matter jurisdiction grounds. But that is consistent with an intent to arbitrate too: the upshot of both motions is that the district court is the wrong forum to hear Plaintiffs' claims.

In ruling otherwise, the district relied on out-of-circuit precedent holding (contrary to decisions of this Court) that filing a motion to dismiss is a per se waiver of the right to arbitrate. It also faulted Cultural Care for not summarily averting to its arbitration defense in one of its earlier filings and for purportedly prejudicing Plaintiffs. This too disregarded binding precedent that neither delay in asserting an arbitration right or prejudice to the other party alone give rise to waiver.

## STANDARD OF REVIEW

This Court reviews *de novo* a district court order resolving a motion to compel arbitration, including whether arbitration was waived. *Marie v. Allied Home Mortg. Corp.*, 402 F.3d 1, 9 (1st Cir. 2005); *see, e.g.*, *Bossé*, 992 F.3d at 27.

## ARGUMENT

Article II(3) of the New York Convention provides that a "court of a Contracting State, when seized of an action in a matter in respect of which the parties have made an [arbitration] agreement within the meaning of this article, shall, at the request of one of the parties, refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed." This provision is "self-executing," meaning that it is "equivalent to an act of the legislature … without the aid of any legislative provision." *Green Enters., LLC v. Hiscox Syndicates Ltd. at Lloyd's of London*, 68 F.4th 662, 666-67 (1st Cir. 2023) (citation omitted). 9 U.S.C. § 202 in turn codifies this self-executing article.

When, as here, a party moves to compel arbitration under the New York Convention and "Chapter Two of the" FAA, the district court's inquiry is "very limited." *Ledee v. Ceramiche Ragno*, 684 F.2d 184, 186 (1st Cir. 1982). The court should resolve just "four preliminary questions:" whether (1) there is an "an agreement in writing to arbitrate … the dispute"; (2) the agreement provides "for arbitration in the territory of a [Convention] signatory"; (3) the agreement arises out

of a "commercial" relationship; and (4) "a party to the agreement [is] not an American citizen." *Id.* at 186-87 (internal citations omitted). "If the district court resolves those questions in the affirmative ..., then it must order arbitration unless it finds the agreement 'null and void, inoperative or incapable of being performed.'" *Id.* at 187 (quoting New York Convention, art. II(3)). Courts have no other discretion to deny a motion to compel arbitration. *Id.* at 187 n.3.

Most of these issues were uncontested below. Plaintiffs' agreement provides for arbitration in Switzerland, Add.19, which is a New York Convention signatory, *see* United Nations Commission on Int'l Trade L., "Status: Convention on the Recognition and Enforcement of Foreign Arbitral Awards (New York, 1958)," https://tinyurl.com/2s4xywxp (last visited Apr. 30, 2024). Plaintiffs themselves allege that they have a commercial relationship with ICL and Cultural Care. A87 (¶187) ("Plaintiffs and those similarly situated were engaged in commerce ...."). And Plaintiffs are not American citizens. A54, A58 (¶¶8-10, 31).

The only two contested issues were whether the arbitration agreement covers Plaintiffs' claims, and whether Cultural Care waived its arbitral rights, leaving the arbitration "agreement 'null and void, inoperative or incapable of being performed.'" *Ledee*, 684 F.2d at 187 (quoting New York Convention, art. II(3)). The district court erroneously resolved both issues against Cultural Care.

## I. THE DISTRICT COURT ERRED IN RULING THAT PLAINTIFFS' CLAIMS ARE NOT ARBITRABLE

The district court erred in ruling that Plaintiffs' claims were not arbitrable for two independent reasons. *First*, the court should not have decided the threshold arbitrability issue itself, including whether Cultural Care is entitled to enforce the arbitration provision, because the parties clearly and unmistakably delegated these issues to the arbitral tribunal. *Second*, in the alternative, the district court erred in ruling that Cultural Care could not enforce Plaintiffs' arbitration agreement with ICL, Cultural Care's Swiss affiliate.

### A. The Parties Clearly And Unmistakably Delegated All Aspects Of Arbitrability To The Arbitral Tribunal

"[W]here the parties have agreed to arbitrate, the FAA requires 'courts to rigorously enforce arbitration agreements according to their terms.'" *Bossé*, 992 F.3d at 27 (citation omitted). This precept "applies to the enforcement of delegation clauses…. [W]here the parties 'by clear and unmistakable evidence' delegate issues of arbitrability to the arbitrator, 'the courts must respect the parties' decision as embodied in the contract' and send the issue to the arbitrator to decide." *Id.* (quoting *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 65 (2019)). When parties delegate arbitrability to the arbitral tribunal, the tribunal determines both an arbitration provision's scope and the movant's right to enforce the arbitration provision. *See Berg*, 886 F.2d at 472; *Becker v. Delek US Energy, Inc.*, 39 F.4th

351, 356 (6th Cir. 2022) ("Whether a non-signatory can enforce a delegation clause" can be delegated to the arbitrator.).[1]

Under this Court's precedent, parties clearly and unmistakably delegate arbitrability to the arbitrator by agreeing to arbitrate in an arbitral forum in which the rules empower the arbitrator to resolve all challenges to its jurisdiction. In *Berg*, "the parties agreed that all disputes arising out of or in connection with their contract would be settled by binding arbitration 'in accordance with the rules of arbitration of the International Chamber of Commerce ['ICC'].'" 886 F.2d at 473. The ICC rules provided that the arbitrator would "have jurisdiction, even though the contract itself may be inexistent or null and void, to determine the respective rights of the parties and to adjudicate upon their claims and pleas." *Id.* This Court held that agreeing to such rules constitutes an enforceable delegation of arbitrability to the arbitrator, including arguments that the nonsignatory movant did not have "th[e] right to" compel arbitration. *Id.* at 472 (Apollo "argues that even if Dico had the right to compel arbitration of the claims, it had not validly assigned that right to the defendants…. We do not reach any of these arguments because we find that the parties contracted to submit issues of arbitrability to the arbitrator.").

---

[1] When there is a delegation clause, the court's role is "limited to determining [] whether a valid arbitration agreement exists." *Bossé*, 992 F.3d at 28 (citation omitted). Cultural Care produced the arbitration agreements that Plaintiffs signed. A270-81. And Plaintiffs did not challenge their validity. *See* Dist. Ct. ECF 368; A601-53.

*Berg* follows from basic contract principles. Parties are free to incorporate arbitral rules by reference, just as any contract can "include[] documents by cross-reference[]." *Awuah*, 554 F.3d at 12 n.4. And "an arbitration agreement" is merely "'a specialized kind of forum-selection clause that posits not only the situs of suit *but also the procedure to be used in resolving the dispute*.'" *Viking River Cruises, Inc. v. Moriana*, 596 U.S. 639, 653 (2022) (emphasis added) (quoting *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519 (1974)). Agreeing to resolve disputes in an arbitral forum thus necessarily constitutes an agreement to follow that forum's rules.

Every other circuit has reached the same result where parties agree to follow "*any* arbitration rules that explicitly delegate arbitrability determinations to the arbitrator." *Dish Network L.L.C. v. Ray*, 900 F.3d 1240, 1253 (10th Cir. 2018) (Tymkovich, C.J., concurring) (emphasis in original); *see, e.g.*, *Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1075 (9th Cir. 2013) ("Virtually every circuit to have considered the issue has determined that incorporation of the American Arbitration Association's [('AAA')] arbitration rules constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability.") (collecting cases from the Federal, Second, Fifth, Eighth, and Eleventh Circuits); *id.* (agreeing

U.N. Commission on International Trade Law arbitration "clearly and unmistakably delegate questions of arbitrability to an arbitrator").[2]

Plaintiffs' arbitration agreement clearly and unmistakably delegated arbitrability to the arbitrator under this line of precedent. The arbitration provision states: "[T]he parties submit and consent to the exclusive jurisdiction and venue of the arbitrational tribunals of Switzerland." Add.20 (¶15). There are only two "arbitrational tribunals" in Switzerland for general commercial disputes like this one: the Swiss Arbitration Centre and the ICC International Court of Arbitration. A290 (listing these two forums and two other tribunals limited to sport and intellectual property disputes). The rules for both tribunals expressly reserve to the arbitrator the power to rule on any objections to their jurisdiction. *See* Swiss Rules of Int'l Arbitration art. 23(1) (A312), https://tinyurl.com/5n7a9sse ("Swiss Rules") ("The arbitral tribunal shall have the power to rule on any objections to its jurisdiction, including regarding the existence, validity or scope of the Arbitration Agreement …."); Int'l Chamber of Commerce, 2021 Arbitration Rules art. 6(3) (A315), https://tinyurl.com/3pxxvtrm ("ICC Rules") ("[I]f any party raises one or more pleas concerning the existence, validity or scope of the arbitration agreement

---

[2]   *Oracle* suggested that *Riley Manufacturing Co. v. Anchor Glass Container Corp.*, 157 F.3d 775, 777 & n.1, 780 (10th Cir. 1998), was the sole outlier. But the Tenth Circuit later rejected this reading of its precedents and now follows *Berg*. *See Dish Network*, 900 F.3d at 1247-48 & n.3 (majority op.).

… any question of jurisdiction … shall be decided directly by the arbitral tribunal ….").  Indeed, the International Court of Arbitration's ICC rules are the very same rules that this Court held in *Berg* delegated arbitrability to the arbitrator.  *See* 886 F.2d at 473.  And both tribunals specify that their rules will govern any matter brought before them.  *See* ICC Rules, *supra*, art. 1(2), https://tinyurl.com/5n7a9sse; Swiss Rules, *supra*, art. 1(3), https://tinyurl.com/3pxxvtrm.  Plaintiffs do not dispute any of this.  *See* Dist. Ct. ECF 368 at 4-5.

This Court's decision in *Bossé*, 992 F.3d 20, is instructive as well.  *Bossé* held that an employment agreement clearly and unmistakably delegated arbitrability to the arbitrator when the parties agreed to submit claims before "an arbitration proceeding administered by the [Financial Industry Regulatory Authority ('FINRA')]."  *Id.* at 24.  The applicable FINRA rules did not delegate arbitrability to the arbitrator.  *See id.*  But the employment agreement also provided that if FINRA declined to arbitrate the claims, the claims would instead be arbitrated before the AAA, the rules of which did delegate arbitrability to the arbitrator.  *See id.*  Even though the AAA would administer the arbitration proceeding only "[i]n the event that [FINRA] refuses to arbitrate the Claim," *id.* at 36 (Barron, J., dissenting), this Court still concluded that the parties had clearly and unmistakably agreed to delegate arbitrability under the AAA rules, *see id.* at 29 (majority op.).

This case is far easier than *Bossé*. Here, Plaintiffs agreed that "the arbitrational tribunals of Switzerland" would have "exclusive jurisdiction and venue." Add.20. There are only two such tribunals, and the rules of both delegated arbitrability to the arbitrator. Unlike *Bossé*, there never was any possibility of arbitrating this case before a tribunal without power to determine arbitrability.

The Federal Circuit's decision in *ROHM Semiconductor USA, LLC v. MaxPower Semiconductor, Inc.*, 17 F.4th 1377 (Fed. Cir. 2021), is also akin to this case. The *ROHM* parties agreed to arbitrate "in accordance with the provisions of the California Code of Civil Procedure" ("CCCP"). *Id.* at 1379. But the CCCP contained "many provisions related to arbitration" (six total), and only one such provision delegated the threshold arbitrability question to the arbitrator. *See id.* at 1380 n.2. The contract did not specify which of these provisions applied, but it was "clear" that only one such provision could apply, and that provision delegated the arbitrability issue to the arbitrator. *See id.* So too here: The parties agreed to arbitrate before only one of two arbitral tribunals, and the rules of both plainly delegate arbitrability to the arbitrator.

Cultural Care led with this delegation argument below, *see* Dist. Ct ECF 312 at 6-8, but the district court never addressed it. The court simply ruled that, because "[t]he arbitration [provision] makes no mention of the arbitrator resolving disputes about whether an entity is itself a party for the purposes of enforcement," "[i]t

21

necessarily follows" that the parties did not delegate arbitrability to the arbitrator. Add.13. This ruling conflicts with *Bossé*'s and *Berg*'s holdings that *all* disputes about arbitrability must be resolved by the arbitrator.

Plaintiffs contended below that *Bossé* and *Berg* do not control because they were not "sophisticated commercial parties," but, rather, were "foreign workers" who supposedly were unable to ascertain which arbitral tribunals operate in Switzerland and under what rules. Dist. Ct. ECF 368 at 4-5. The district court did not endorse this argument, *see* Add.13, and neither should this Court. The *Bossé* and *Berg* principle, that agreeing to arbitrate under an arbitral tribunal's rules incorporates those rules by reference, applies to *all* types of contracts and is not "limit[ed] … to sophisticated parties or to commercial contracts." *Brennan v. Opus Bank*, 796 F.3d 1125, 1131 (9th Cir. 2015) (collecting authorities).

Indeed, this Court in *Awuah*, 554 F.3d 7, rejected the argument Plaintiffs advanced below. Although it declined to compel arbitration for other reasons, it affirmed that a franchise agreement between a large corporation and individual janitors delegated arbitrability to the arbitrator because the parties agreed to arbitrate under AAA rules, and the AAA rules made that delegation. *See id.* at 9, 12. *Awuah* conceded that it was "doubtful that many people read the small print in form contracts, let alone the small print in arbitration rules that are cross-referenced by such contracts," and that the plaintiffs were "often far from sophisticated business

22

men and women" who had signed "contracts of adhesion." *Id.* at 12. But that did not matter. "[C]ourts have no general power to relieve parties of bad bargains ...." *Id.*

*Awuah* was correct and applies here. The FAA "establishes an equal treatment principle," under which courts must interpret arbitration agreements the same way they interpret all other contracts, and cannot invent "arbitration-specific" rules of contract law. *Kindred Nursing Centers Ltd. v. Clark*, 581 U.S. 246, 251 (2017). And so, as with all contract interpretation, a party's subjective knowledge or understanding of an arbitration agreement is irrelevant to that agreement's meaning. *See, e.g.*, *Gibson v. City of Cranston*, 37 F.3d 731, 737 (1st Cir. 1994) (acknowledging that "contract interpretation" is "based largely on a standard of objective reasonableness rather than purely subjective belief"). What matters is "the parties' 'objective intent, as evidenced by the words of the contract.'" *DiCarlo v. MoneyLion, Inc.*, 988 F.3d 1148, 1152 (9th Cir. 2021) (citation omitted); *see* A570 (holding, under Swiss law, that when the parties do not share a "concordant" interpretation of a contract, courts conduct an "objectified interpretation of declarations of intent as a question of law"). And *Apollo* and *Bossé* have already interpreted and decided the objective meaning of the arbitration provision here.

In any case, Plaintiffs understate their sophistication. Participants in the au pair exchange program are no less capable of reading the contract they signed than

23

the plaintiffs in *Awuah*.  Every au pair is "proficient in spoken English" and "a secondary school graduate or equivalent."  22 C.F.R. § 62.31(d)(2)-(3).  The contract they signed were just two pages long, far shorter than most employment contracts and residential leases that courts routinely enforce.  Google searches would reveal only two applicable arbitral tribunals operating in Switzerland, the rules of which (also available via Google) delegate arbitrability to the arbitrator.  Thus, under *Berg*, *Awuah*, and *Bossé*, the parties delegated arbitrability to the arbitral tribunal, and the district court erred as a matter of law in ruling otherwise.

**B.  In The Alternative, This Court Should Hold That Plaintiffs' Claims Are Arbitrable**

Even if the parties did not delegate arbitrability to the tribunal, this Court should still reverse because the district court erred in ruling that there was no agreement "to arbitrate the subject of the dispute," *Ledee*, 684 F.2d at 186.  When a valid arbitration agreement exists under the New York Convention and the parties have not delegated arbitrability to the tribunal, a court must compel arbitration when (1) "the movant is entitled to invoke the arbitration clause," (2) "the other party is bound by that clause," and (3) "the claim asserted comes within the clause's scope." *InterGen N.V. v. Grina*, 344 F.3d 134, 142 (1st Cir. 2003).  The law of the contract— here, Swiss law, *e.g.*, Add.20 (¶15)—determines whether claims are arbitrable. *See, e.g.*, *Ribadeneira v. New Balance Athletics, Inc.*, 65 F.4th 1, 20 n.13 (1st Cir. 2023)

24

(applying Massachusetts law because agreement contained a Massachusetts choice-of-law clause).[3]

Plaintiffs are plainly bound by the arbitration provision: Cultural Care "provided signed copies of the identical Contract [containing the arbitration provision] for each of the named Plaintiffs." Add.9 n.1 (assuming without deciding that Cultural Care had met its burden on this element); *see* A270-81. Arbitration should thus be compelled if Cultural Care is entitled to invoke the arbitration provision and Plaintiffs' claims come within the provision's scope.

### 1. Cultural Care Is Entitled To Invoke The Arbitration Provision

Under the New York Convention, contract non-signatories like Cultural Care may invoke third-party beneficiary and equitable estoppel doctrines to enforce arbitral agreements. *See, e.g.*, *GE Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 590 U.S. 432, 440-41 (2020). State law determines the applicability of these "domestic doctrines." *Id.* at 440; *see Ribadeneira*, 65 F.4th at 20 n.13; *see, e.g.*, *Grand Wireless, Inc. v. Verizon Wireless, Inc.*, 748 F.3d 1, 12 (1st Cir. 2014) ("[S]tate law governs the inquiry as to whether a non-party to an

---

[3] In some of this Court's earlier cases, this Court applied federal common law to this inquiry when the parties did not argue for a different choice of law on appeal. *See infra*, pp.30-31. *Ribadeneira* has since clarified that the law of the contract controls. There is, however, no relevant difference between Swiss law and federal common law, so there is no need for this Court to conduct a choice-of-law analysis.

arbitration agreement can assert the protection of the agreement."). The underlying contract is governed by Swiss law, Add.20 (¶15), but Swiss law is equivalent to federal common law for purposes of this case, and so there is no need to conduct a choice-of-law analysis. *See, e.g.*, *OneBeacon Ins. Co. v. Georgia-Pac. Corp.*, 474 F.3d 6, 9 (1st Cir. 2007) ("bypass[ing]" choice-of-law question because "there do not appear to be significant differences in the laws of the relevant states"). Under both Swiss and federal common law, Cultural Care is entitled to compel arbitration because it is a third-party beneficiary of Plaintiffs' contract with ICL and because Plaintiffs are equitably estopped from avoiding the arbitration provision.

### (a) Cultural Care Is A Third-Party Beneficiary Of The Agreement

Under Swiss law, a "beneficiary of a genuine third-party beneficiary clause ... acquires, against the debtor (or promisor), a claim with all the preferential rights and other accessory rights attached to it, including the arbitration clause." A574 (Reason 2.4.1 of Federal Court Decision of 19 April 2011, 4A_44/2011). U.S. courts follow the same principle. *See, e.g.*, *Grand Wireless*, 748 F.3d at 12 (recognizing "'traditional principles' of state law allow a contract to be enforced by or against nonparties to the contract through ... 'third-party beneficiary theories'") (quoting *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009)).

A third party is an intended beneficiary of a contract, and thus entitled to enforce that contract, if the contract was "entered into ... 'for the benefit of'" that

third party. *Rae v. Air-Speed, Inc.*, 386 Mass. 187, 195, 435 N.E.2d 628, 633 (1982); *see, e.g.*, A577 (Para. 5 of BSK OR 1-ZELLWEGER-GUTKNECHT, Art. 112) ("The contract for the benefit of third parties is based on an expression of intent by the contracting parties, which is aimed at performance to a third party."). This requires a showing of "special clarity that the contracting parties intended to confer [such] a benefit on" the third party. *McCarthy v. Azure*, 22 F.3d 351, 362 (1st Cir. 1994).

Cultural Care is an intended beneficiary of Plaintiffs' contract with ICL. The contract specifies "the [] terms and conditions … relating to the au pair's participation in Cultural Care Au Pair au pair program (the 'Program')." Add.19. Plaintiffs agreed "to abide by ... terms and conditions stipulated by [ICL] during the Program," as well as "the [State Department] Program regulations"; to "perform the child care responsibilities as outlined by [ICL]"; to resolve all stipend disputes with the host families directly; and to "notify the staff of [ICL] in the U.S. in case of" any problems arising with the host families. Add.19 (¶¶1-4, 7-8). These provisions are all intended to benefit Cultural Care, not ICL. As Plaintiffs themselves allege, Cultural Care, not ICL, is the party that ensures compliance with these requirements in the United States. *See* A56-57.

Although the contract refers to ICL in some of these paragraphs, Cultural Care is the actual State Department designee, and it, not ICL, "oversees the au pairs'

participation in the Program in the United States as directed by the [State Department]." A267. ICL, which merely performs the "identification, screening, and preparation of prospective au pairs" before their U.S. arrival, A267, thus does not benefit from these contract provisions. Cultural Care is the only possible intended beneficiary of these provisions. That, no doubt, is why the contract refers to ICL as "Cultural Care," and not ICL. Add.19. Cultural Care is thus a third-party beneficiary of the contract. *See* A538 (¶28(c)-(e)); *cf. Grand Wireless*, 748 F.3d at 11 (extending arbitration agreement to third-party employees because "it would have made little sense to have agreed to arbitrate if the employees could be sued separately without regard to the arbitration clause").

Paragraph 14 is also expressly intended for the benefit of Cultural Care: Plaintiffs there "agree[d] to ... release and forever discharge [ICL] and its affiliates ... ( ... 'Released Parties'), from any and all claims ... which arise out of ... injury, damage or loss of any other kind ... resulting from or during participation in the Program." Add.20. It was undisputed below that Cultural Care is an "affiliate" of ICL entitled to invoke this provision. A266. In the same Paragraph, Plaintiffs also "agree[d] to indemnify and hold harmless the Released Parties from and against any losses, claims, damages or liabilities related to or arising out of [their] participation in the Program." Add.20. That language, releasing Cultural Care from Plaintiffs' claims and indemnifying Cultural Care against any losses relating to Cultural Care's

au pair program, is "intended to confer a benefit on" Cultural Care. *McCarthy*, 22 F.3d at 362. Cultural Care is thus a "third-party beneficiary" based on this provision alone. A537; *see* A538 (citing Swiss law authorities holding that parties indemnified against losses are third-party beneficiaries entitled to enforce the underlying contract); *see also, e.g.*, *Allen v. Katz Agency, Inc. Emp. Stock Ownership Plan*, 677 F.2d 193, 197 (2d Cir. 1982) ("The Plan, though not specifically named, was effectively a third-party beneficiary of the release in the termination agreement.").

The district court did not dispute that Cultural Care was a third-party beneficiary of ICL's contract with Plaintiffs or Paragraph 14. Instead, it incorrectly ruled that Cultural Care could not move to compel arbitration because it was not a third-party beneficiary of "the arbitration provision" itself. Add.15 ("Here, the arbitration provision does not even make an ambiguous reference that could be construed to include Cultural Care Inc. as a third-party beneficiary."). This is a category error. Cultural Care need only show that it is a "third-party beneficiary of a contract containing an arbitration clause," *not* that the arbitration provision was specifically intended for its benefit. *InterGen*, 344 F.3d at 143, 146 (applying federal common law); *see, e.g.*, Restatement (Third) U.S. Law of Int'l Comm. Arb. § 2.3 (2023) ("[A] third-party beneficiary *of a contract* may invoke or be bound by an arbitration agreement *contained in that contract*.") (emphases added); A570 (Reason 3.1.1 of Federal Court Decision of 6 October 2016, 4A_310/2016) (A "third-party

beneficiary" of a contract is entitled to "invoke [the arbitration] clause ... , unless the arbitration clause specifically excludes this.").

To be sure, under *InterGen* and this Court's other precedents, the district court could consider whether the arbitration provision's *scope* specifically excludes Plaintiffs' claims against Cultural Care. *See infra*, Part I.B.2. But Cultural Care was not required to show that the arbitration provision itself was *intended* to benefit Cultural Care. Imposing such a requirement would not make any sense: the point of an arbitration provision is to guarantee "orderliness and predictability" and a neutral "forum" for all contract beneficiaries. *Scherk*, 417 U.S. at 516. If the district court were correct, then no arbitration provision could ever protect a third-party beneficiary unless it identified the beneficiary by name. *See also infra*, pp.42-43.

This Court's precedents illustrate the district court's mistake. In *InterGen*, this Court made clear that whether "the movant is entitled to invoke the arbitration clause," including under a third-party beneficiary theory, is distinct from whether "the claim asserted comes within the clause's scope." 344 F.3d at 143 (applying federal common law because no party argued for any other choice of law, *see id.* at 143 & n.4). *Hogan v. SPAR Group*, 914 F.3d 34 (1st Cir. 2019), also distinguished "show[ing] an intent of the parties to confer upon it some benefit unrelated to the arbitration" from "language of the arbitration clause" that "limits its applicability to the signatories." *Id.* at 40 (applying federal common law by default, *see id.* at 39

n.5). And *Ouadani v. TF Final Mile LLC*, 876 F.3d 31 (1st Cir. 2017), looked for "any language in the Agreement," not just the arbitration provision, "that can be read to provide Ouadani with 'specific legal rights.'" *Id.* at 39 (citation omitted) (applying federal common law); *see Ribadeneira*, 65 F.4th at 23-24 (applying Massachusetts law) (distinguishing whether non-signatory was bound by arbitration agreement under an assumption, from whether arbitration agreement reached the claims); *see also Med. Air Tech. Corp. v. Marwan Inv., Inc.*, 303 F.3d 11, 18 (1st Cir. 2002) (applying Massachusetts law) (Under equitable estoppel, a "party seeking the benefit of a contract could not refuse to be bound by *a clause contained within it*.") (emphasis added).

Affirming the district court's order would improperly discriminate against arbitration. An arbitration agreement is nothing more than "a specialized kind of forum-selection clause," *Scherk*, 417 U.S. at 519, and so courts apply "arbitration principles to forum selection," and vice versa, *IAC/InterActiveCorp v. Roston*, 44 F.4th 635, 640 (7th Cir. 2022). "Under traditional principles of contract law, non-signatories may be bound by a forum selection clause if they are intended third-party beneficiaries of *the contract*," not the forum selection clause itself. *In re McGraw-Hill Glob. Educ. Holdings LLC*, 909 F.3d 48, 59 (3d Cir. 2018). The district court's ruling thus violates the FAA's "equal treatment principle," under which courts

cannot develop rules that uniquely disfavor arbitration. *Viking River Cruises*, 596 U.S. at 650 (citation and quotation marks omitted).

The district court's error seems to have stemmed from its misreading of *Landry v. Transworld Systems*, 485 Mass. 334, 149 N.E.3d 781 (2020), a noncontrolling case that neither party cited. *See* A616-17 (the court referencing this case during colloquy). The district court derived its restrictive understanding of third-party beneficiary law from the following passage in *Landry*: "a nonsignatory seeking to enforce an arbitration agreement as a third-party beneficiary must point to clear and definite evidence of the parties' intent that it benefit from the provision." 485 Mass. at 342, 149 N.E.3d at 788 (cleaned up); *see* Add.14. But the court misunderstood *Landry*. The movant in *Landry* had argued that it was a third-party beneficiary of "the arbitration provision" itself (not other contractual provisions), a position that *Landry* summarized in the paragraph preceding the quotation at issue. 485 Mass. at 342, 149 N.E.3d at 788. *Landry* was thus simply applying the law to the facts of that case. And "'general language in judicial opinions' should be read 'as referring in context to circumstances similar to the circumstances then before the Court and not referring to quite different circumstances that the Court was not then considering.'" *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 278 (2023) (quoting *Illinois v. Lidster*, 540 U.S. 419, 424 (2004)).

The district court thus erred in ruling that Cultural Care could not invoke the arbitration provision as a third-party beneficiary of the underlying contract.

### (b) Plaintiffs Are Equitably Estopped From Avoiding Arbitration Against Cultural Care

Under the Swiss law principle of good faith, "[w]hen a party adopts a certain position, it cannot then take on the opposite position, as this would be tantamount to deceiving the well-founded expectation which it has created in his opponent." A594 (Reason 2.1 of the Federal Court Decision of 26 January 2017, 4A_590/2016). This "principle of good faith is functionally equivalent to the American legal concept of equitable estoppel." A539 (¶31); *see* A592 (Reason 4.3.2.2 of the Federal Administrative Court Decision of 2 March 2016, A-4695/2015) (same). Under this principle, a nonsignatory to an arbitration agreement can move to compel arbitration when the plaintiff's claims "either directly or indirectly invoke the terms of the [underlying] Agreement." *Sourcing Unlimited, Inc. v. Asimco Int'l, Inc.*, 526 F.3d 38, 47 (1st Cir. 2008) (applying federal common law "absen[t] [] any contention from the parties to the contrary," *id.* at 46). (Because Swiss and U.S. legal principles are equivalent, Cultural Care uses the term "equitable estoppel" in this brief.)

Equitable estoppel applies here. Plaintiff themselves concede that their wage-and-hour claims hinge on their allegations that Cultural Care "retains full discretion of whether to end an au pair's placement," "whether to end an au pair's participation in the program entirely," and "whether to permit their participation in the first place."

33

Appellee Br. 50, *Morales Posada v. Cultural Care, Inc.*, No. 21-1676 (1st Cir. Mar. 17, 2022) (citing A58 (¶¶24-25)). All these powers, they assert, give "Cultural Care[] control over Plaintiffs' 'conditions of employment,'" *id.* at 52 n.11, and establish "an employment relationship," *id.* at 51-52. But these policies and powers all stem from Plaintiffs' ICL contract that contain the arbitration provision. It is pursuant to this contract that Plaintiffs "submit[ted]" materials to ICL, Add.19 (¶2), which ICL used to "screen[] prospective au pairs before [Cultural Care] facilitates the matching process," A267; that ICL and Cultural Care provide au pairs with potential "appropriate host families" that they may choose, Add.19 (¶8); and that ICL and Cultural Care reserved "the exclusive right to determine [their] suitability for acceptance and for [their] continued participation in the Program," including the right to remove au pairs from the Program or place them with new host families for numerous reasons, Add.19 (¶10); *see id.* (¶¶4-5, 9). Plaintiffs' employment allegations, in short, all stem from this contract.

Plaintiffs' complaint makes other allegations stemming from their ICL contract about Cultural Care's activities and purported control that render it an employer. Plaintiffs allege that Cultural Care "[r]equire[d] that the au pair's schedule be limited to 45 hours per week, with a maximum of 10 hours per day," A57 (¶24(b)); "require[d] all its au pairs to attend four days of training prior to traveling to their host family," A59 (¶29); and "[d]ictate[d] that the au pair will

34

perform childcare services," A57 (¶24(f)). These requirements are all spelled out in ICL's contract with Plaintiffs. *See* Add.19 (¶3) (agreeing to "stay[] within the legal number of working hours per day and week"); Add.19 (¶3)(agreeing to "participat[e] in all child safety and child development training and orientation sessions sponsored by [Cultural Care]"); Add.19 (¶4) (agreeing "to perform child care responsibilities").

Notably, Plaintiffs' allegations in this case mirror those in a parallel wage-and-hour au pair class action against *both* ICL and Cultural Care in California state court, which alleges that this same conduct renders ICL and Cultural Care employers under California wage-and-hour law. A357-58 (¶¶13-15). That court compelled arbitration. *See Kudlacz v. Cultural Care, Inc.*, slip op., No. CGC-20-584567 (Cal. Super. Ct. Aug. 2, 2023) (A502-17). Plaintiffs cannot avoid arbitration simply by omitting any reference to ICL in their complaint.[4]

To be sure, these contractual provisions were between Plaintiffs and ICL, not Cultural Care, but Plaintiffs do not distinguish between ICL and Cultural Care in their complaint. Instead, Plaintiffs conflate ICL and Cultural Care, and treat them as one entity. *Compare* A57 (alleging that Cultural Care screens, interviews, and selects au pairs), *with* A266 (ICL performs these functions). Plaintiffs thus ignore corporate differences to impose wage-and-hour obligations on Cultural Care, but then invoke their corporate separateness to resist Plaintiffs' own arbitration

---

[4] The *Kudlacz* California action was also brought by Plaintiffs' counsel here.

obligations.  Equitable estoppel bars Plaintiffs from "opportunistically adopting [these] inconsistent stances."  *Ribadeneira*, 65 F.4th at 27.

This case is akin to *Machado v. System4 LLC*, 471 Mass. 204, 28 N.E.3d 401 (2015), where the Supreme Judicial Court held that a contract nonsignatory could enforce an arbitration provision against wage-and-hour claims like Plaintiffs'.  The plaintiffs were franchisee workers who sued the sub-franchisor and a master franchisor, who was not a signatory to the franchise agreements containing an arbitration provision, for misclassifying them as independent contractors.  471 Mass. at 204-07, 28 N.E.3d at 404-06.  The Court held that the master franchisor could enforce the arbitration provision against the plaintiffs under equitable estoppel principles because the agreements were "replete with references to the plaintiffs' duties and responsibilities." 471 Mass. at 214, 28 N.E.3d at 411.  Plus, "an important element of a working relationship is the contract responsible for creating it," and so it would be unfair to allow the plaintiffs to benefit from the agreements bringing their Wage Act claims while avoiding the arbitration provisions contained in the same agreements.  471 Mass. at 215, 28 N.E.3d at 411-12.  So too here.  *See, e.g.*, *Franklin v. Cmty. Reg'l Med. Ctr.*, 998 F.3d 867, 875 (9th Cir. 2021) (statutory wage-and-hour claims was intertwined, for equitable estoppel purposes, with employment contracts containing arbitration provisions).

The district court's ruling to the contrary is unpersuasive. It stated that "[t]he actions that Plaintiffs allege established Cultural Care Inc. as their employer—and that serve as the crux of their claims—are not covered by" the contract. Add.16-17. But that is not true, as discussed *supra*, pp.33-36. The court acknowledged that Plaintiffs' contract with ICL required them to "stay[] within the legal number of working hours per day and per week." Add.17; *see supra*, p.34. But it disregarded this complaint-contract overlap because it thought that "Plaintiffs do not contend that they were forced to work outside of any legal hour maximum." Add.17. This too is incorrect. Plaintiffs allege that Ms. Morales Posada's host family forced her to work more hours per week than was legally permitted. A59 (¶¶40, 45).[5]

### 2. Plaintiffs' Claims Are Within The Arbitration Provision's Scope

"'[A]s a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.'" *Ribadeneira*, 65 F.4th at 15 n.8 (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983)). This reflects the "'liberal federal policy favoring arbitration agreements,'" and Congress's "'unmistakably clear [] purpose that the arbitration procedure, when

---

[5] In a parenthetical citation, the court referred (Add.17) to a line of dictum in *Hogan* that "Hogan's claims would exist even if the Master Agreement were declared void." 914 F.3d at 42. This Court has since clarified that "the unenforceability" of an arbitration agreement "does not preclude compelling [the contract signatory] to abide by that agreement's arbitration clause by the application of equitable estoppel." *Ribadeneira*, 65 F.4th at 27.

selected by the parties to a contract, be speedy and not subject to delay and obstruction in the courts.'" *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 505-06 (2018) (first quoting *Moses H. Cone*, 460 U.S. at 24; second quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 (1967)). "[T]hat federal policy applies with special force in the field of international commerce." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985).[6] Swiss law applies the same "strong presumption" and liberal construction of arbitration provisions. A536 (¶23).

Plaintiffs' arbitration provision covers claims against third parties like Cultural Care. It extends to both (1) "any claim, dispute, or proceeding arising out of [Plaintiffs'] relationship with" ICL and (2) "any claim ... between the parties, whether or not related to this Agreement." Add.20 (¶15). Because clause (2) covers

---

[6] Plaintiffs contended below that the Supreme Court's repeated reaffirmance of this liberal policy favoring arbitration does not survive its decision in *Morgan v. Sundance, Inc.*, 596 U.S. 411 (2022). *See* Dist. Ct. ECF 368 at 6. Not so. *Morgan* held that courts may not "condition a waiver of the right to arbitrate on a showing or prejudice." 596 U.S. at 417. It so held because courts cannot "make up a new procedural rule based on the FAA's 'policy favoring arbitration.'" 596 U.S. at 419. But *Morgan*, which was not a New York Convention case, did not disturb the decades of precedent as to the proper interpretation of arbitration provisions, especially in international commercial disputes. This Court's longstanding precedents about the proper interpretation of arbitration provisions thus continue to control. *See Muskat v. United States*, 554 F.3d 183, 189 (1st Cir. 2009). Indeed, after *Morgan*, this Court has continued to reaffirm that arbitration agreements should be construed broadly. *See Ribadeneira*, 65 F.4th at 15 n.8. Finally, regardless of whether this federal policy exists, Swiss law applies this presumption, *supra*, p.38.

all disputes between ICL and Plaintiffs "whether or not related to the" contract, clause (1) must *necessarily* extend to Plaintiffs' claims against third parties. Otherwise, clause (1) would be superfluous. *See, e.g.*, *In re Oak Knoll Assocs., L.P.*, 835 F.3d 24, 32 (1st Cir. 2016) ("[C]ontract interpretation militates against interpreting a contract in a way that renders a provision superfluous.") (citation omitted).

It was undisputed below that Plaintiffs' claims here "arise out of [their] relationship" with ICL, Add.20 (¶15), the Cultural Care affiliate that signed the arbitration agreement with Plaintiffs. Plaintiffs argued that their claims did not fall within clause (2) of the arbitration provision (claims "between the parties"), but they *never* disputed that their claims arose out of their "relationship" with ICL and thus fall within clause (1). *See* Dist. Ct. ECF 368 at 9-10. Because "'arbitration is strictly a matter of consent,'" *Viking River Cruises*, 596 U.S. at 651 (quoting *Granite Rock Co. v. Teamsters*, 561 U.S. 287, 299 (2010)), this is strong evidence that clause (1) of the arbitration provision covers Plaintiffs' claims, *see, e.g.*, *Al Rushaid v. Nat'l Oilwell Varco, Inc.*, 757 F.3d 416, 419 (5th Cir. 2014) (not revisiting scope of arbitration agreement when it was "uncontested that the dispute falls within [it]").

Clause (1) plainly covers Plaintiffs' claims. The parties' relationship concerns "the au pair's participation in Cultural Care Au Pair au pair program." Add.19. Plaintiffs' relationship with ICL is defined by "the Program regulations issued by

the United States Department of State (22 C.F.R. Part 62)" and Cultural Care and ICL's "rules." Add.19 (¶3). This includes, as relevant here, ICL's and Cultural Care's roles in:

- "screen[ing] prospective au pairs," A267, and "determin[ing] [their] suitability for acceptance" in the program, Add.20 (¶10);

- "choosing appropriate host families," Add.20 (¶8);

- "arrang[ing]" Plaintiffs' flights to and from the United States, Add.20 (¶12);

- "outlin[ing]" Plaintiffs' "child care responsibilities," Add.19 (¶4);

- serving as Plaintiffs' "primary contacts" in the United States, Add.20 (¶8); and

- taking responsibility for placing au pairs in a new home or removing them from the program if the host families or au pairs fail to comply with applicable rules, Add.20 (¶¶4-5, 9).

Plaintiffs' claims arise from this relationship because they allege that these same duties performed by Cultural Care, and their own childcare responsibilities, make them Cultural Care employees under wage-and-hour laws. *See supra*, pp.33-36; *see also* A538 (¶28(c)) (concluding, as a matter of Swiss law, that this clause covers Plaintiffs' claims).

Their "underlying factual allegations" thus "touch matters covered by the arbitration provision" and fall within its scope. *Parm v. Bluestem Brands, Inc.*, 898 F.3d 869, 874 (8th Cir. 2018) (citation omitted). And the relevant contractual phrase—"aris[e] out of"—is "broad language" that establishes "a 'strong presumption of arbitrability.'" *Ribadeneira*, 65 F.4th at 25 n.18 (quoting *Carpenter v. Pomerantz*, 36 Mass. App. Ct. 627, 629, 634 N.E.2d 587, 589 (1994)); *see, e.g.*, *Medtronic AVE Inc. v. Cordis Corp.*, 100 F. App'x 865, 868 (3d Cir. 2004) ("[W]hen phrases such as 'arising under' and 'arising out of' appear in arbitration provisions, they are normally given broad construction.").

The district court erred in ruling against Cultural Care on this undisputed issue. It analogized, Add.15-16, the arbitration provision here to the one in *Hogan*, 914 F.3d 34, but that case is distinguishable. *Hogan* held that the party invoking the arbitration provision was not a third-party beneficiary, and, only afterwards, stated (as dicta) that the arbitration provision could not cover the third party's claims because "the arbitration clause limit[ed] its applicability to the signatories by only covering disputes 'between the Parties.'" *Id.* at 40. Here, by contrast, the arbitration provision covers disputes arising out of ICL's relationship with Plaintiffs, and Plaintiffs do not dispute that their claims arise out of this relationship. The arbitration provision in *Hogan*, to be sure, also covered disputes "arising out of [the parties'] relationship under [the contract's] terms," but *Hogan* did not address this

41

language when discussing the arbitration provision's scope. *Id.* at 37; *see id.* at 40-41 (omitting this part of the clause in its third-party beneficiary and estoppel analysis). The *Hogan* arbitration provision also limited arbitration to claims under the contract's terms, unlike the provision here. *See id.* at 37 ("Any dispute between the Parties *relating to this Master Agreement* or otherwise arising out of their relationship *under its terms* ….") (emphases added). And in *Hogan*, the party seeking arbitration did not contend that the plaintiffs' claims arose out of the plaintiffs' relationship with their counter-party, only that the movant itself had a close relationship with that counter-party. *Id.* at 42. Here, by contrast, there was no dispute that Plaintiffs' claims arise out of their "relationship with" ICL. *Supra*, p.39.

Finally, the district court "reinforced" its view that the arbitration provision implicitly bars arbitration of claims against Cultural Care because other parts of Plaintiffs' contract mentions Cultural Care but the arbitration provision does not. Add.16; *see* A271-72 (¶¶8, 14) (referring to "affiliates" and "Cultural Care staff in the United States"). Here, the opposite inference is appropriate: the arbitration provision covers *both* disputes "arising out of the relationship of [Plaintiffs] and" ICL, *and* "any claim … between the parties." These clauses would be redundant if claims "arising out of the relationship" referred only to claims between ICL and Plaintiffs. *Supra*, p.38. And an arbitration provision need not refer expressly to a third party to cover claims asserted against that party. *See Hogan*, 914 F.3d at 41

(acknowledging this Court's holding in *Sourcing Unlimited*, 526 F.3d at 41, 48, that an arbitration provision covering any action "relating in any way to" the contract covered claims against a third party). The district court erred in suggesting otherwise. *See* Add.15 ("Here, the arbitration provision does not even make an ambiguous reference that could be construed to include Cultural Care Inc. …."). In any case, *Hogan* relied on an "integration clause" to limit the meaning of the arbitration provision, 914 F.3d at 40, and Plaintiffs' contract has no integration clause. *E.g.*, A271-72.

***

For all these reasons, the district court erred as a matter of law in concluding that Plaintiffs' claims were not arbitrable.

## II. THE DISTRICT COURT ERRED IN RULING THAT CULTURAL CARE WAIVED THE RIGHT TO ARBITRATE

### A. Cultural Care Did Not Intentionally Relinquish Its Right To Arbitrate

"[A] party may waive a right to arbitrate—either explicitly or through its conduct—[but this Court] resolve[s] any doubts in favor of arbitration." *FPE Found. v. Cohen*, 801 F.3d 25, 29 (1st Cir. 2015); *see, e.g.*, *Ribadeneira*, 65 F.4th at 15 n.8. "Such an approach is consistent with a liberal federal policy favoring arbitration." *FPE*, 801 F.3d at 29.

"Waiver" is distinct from "forfeiture." "Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the 'intentional relinquishment or abandonment of a known right.'" *United States v. Olano*, 507 U.S. 725, 733 (1993) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)); *see, e.g.*, *Morgan v. Sundance, Inc.*, 596 U.S. 411, 417 (2022). "Parties are free to waive their rights to arbitration by contract," but "'mere delay in seeking arbitration'" does not amount to waiver. *Restoration Pres. Masonry, Inc. v. Grove Eur. Ltd.*, 325 F.3d 54, 60-61 (1st Cir. 2003) (quoting *Pentzer*, 252 F.3d at 32). A court thus cannot refuse to compel arbitration to penalize a party for not filing its motion earlier; the court must find intentional waiver.

This Court considers five factors when assessing whether a party's litigation conduct evidences an intentional relinquishment of the right to arbitrate, including "(1) whether the parties participated in a lawsuit or took other action inconsistent with arbitration; (2) whether the 'litigation machinery has been substantially invoked and the parties [are] well into preparation of a lawsuit by the time an intention to arbitrate [is] communicated'; (3) 'whether there has been a long delay' and trial is near at hand; (4) whether the party seeking to compel arbitration has 'invoked the jurisdiction of the court by filing a counterclaim'; [and] (5) whether discovery not

available in arbitration has occurred." *FPE*, 801 F.3d at 29 (quoting *Restoration Pres. Masonry*, 325 F.3d at 60-61).[7]

All five of these factors illustrate that Cultural Care has not intentionally relinquished its right to arbitrate. *First*, Cultural Care has not actively participated in this case or taken any action inconsistent with arbitration. This case is barely past the pleadings stage, not "well into preparation." *FPE*, 801 F.3d at 29. *Second*, Cultural Care has not substantially invoked the litigation machinery. It moved to dismiss for lack of subject matter jurisdiction and for failure to state a claim. A99. It then appealed the denial of its Rule 12(b)(1) motion, and, in its appeal, raised its merits arguments only to the extent that they were "inextricably intertwined" with its jurisdictional derivative sovereign immunity arguments. *Morales Posada*, 66 F.4th at 363 (citation omitted). In its only-just-filed answer, Cultural Care asserted the arbitration provision as a defense. A207, A238. *Third*, this case is nowhere close to trial. Delays in this case stem from the parties' agreed extensions and stays of the case schedule. *See* A28, A33-34, A45-47, A50-51, A165-67, A173, A201-03. And courts "refuse[] to find waiver in a number of cases where delay in trial proceedings was not accompanied by substantial motion practice or discovery."

---

[7] This Court also used to consider "whether the party asserting waiver has suffered prejudice." *FPE*, 801 F.3d at 29. But *Morgan* held that courts should not consider prejudice when assessing whether the right to arbitrate has been waived. *See* 596 U.S. at 417; *see also id.* at 416 n.1 (overruling First Circuit precedent).

*Thyssen, Inc. v. Calypso Shipping Corp., S.A.*, 310 F.3d 102, 105 (2d Cir. 2002). *Fourth*, Cultural Care has not invoked the district court's jurisdiction by filing counterclaims. *Fifth*, no discovery, apart from discovery into Cultural Care's motion to compel arbitration, has yet been conducted. Other courts applying *FPE* to similar facts have found no waiver.[8]

After briefly citing the *FPE* factors, Add.7, the district court barely applied them. Instead, it ruled that Cultural Care had "'substantially invoked' the litigation machinery in this case" by filing a motion to dismiss, appealing the denial of that motion, and, while its motion to dismiss was still pending, opposing Plaintiffs' motion for conditional class certification and moving to strike consents to sue that Plaintiffs had filed before obtaining court approval. Add.11. This activity qualified as substantial expenditure of resources, the court ruled, because "[b]oth sides—and two courts—have expended time and resources addressing arguments brought by Cultural Care Inc. on numerous aspects of this case." Add.12.

This ruling contorted waiver doctrine. The court's and Plaintiffs' "time and resources" addressing Cultural Care's motion to dismiss—a point the court raised in

---

[8]    *See, e.g.*, *Buruk v. Experian Info. Sols., Inc.*, 2024 WL 2025747, *5 (D. Mass. May 6, 2024) (no waiver of arbitration even when defendant did not raise arbitration provision in its answer and the parties engaged in settlement discussions and exchanged discovery because "none of the parties responded to discovery or noticed any depositions," defendant did not "assert[] any counterclaim or participat[e] in mediation," and trial was set nearly a year later).

colloquy too, A637 (noting that "the efforts of a judge have been invoked")—cannot be evidence of waiver. "To decide whether a waiver has occurred, the court focuses on the actions of the person who held the right; the court seldom considers the effects of those actions on the opposing party." *Morgan*, 596 U.S. at 417.[9]

The district court notably did not rule that *filing these motions* was, on its own, inconsistent with an intent to arbitrate, but rather that Cultural Care waived its rights by not providing *notice* of its intent to arbitrate in those papers. The court thus said during colloquy that Cultural Care would have preserved its arbitration rights had it "dropped a footnote" in its motion to dismiss advising the court that it would move to compel arbitration if the motion to dismiss were denied. A256. The court repeated this point in its decision, faulting Cultural Care not for filing its motions, but for making "no mention of arbitration" as a potential issue. Add.11. The court's focus on "the timely assertion of [the arbitration] right" conflates forfeiture with waiver, *Olano*, 507 U.S. at 733, and disregards this Court's longstanding precedent that "mere delay in seeking arbitration" cannot give rise to waiver, *e.g.*, *Restoration Pres. Masonry*, 325 F.3d at 32 (citation omitted).

---

[9] Besides, Plaintiffs were not prejudiced. This Court's resolution of Cultural Care's derivative sovereign immunity will be law-of-the-case in any future arbitration proceeding, just as it is here. And Cultural Care informed Plaintiffs that it intended to move to compel arbitration before Plaintiffs sent out collective notices for the prospective class. A198-99, A282-83.

**B.** **Cultural Care's Litigation Conduct Was Not Inconsistent With Its Right To Arbitrate**

Although this Court need go no further to reverse, it bears emphasizing that none of Cultural Care's litigation conduct was inconsistent with its arbitration rights. In *Pentzer*, 252 F.3d 28, this Court held that the moving party had not waived its arbitration rights when it moved to compel arbitration *after* it had both moved to dismiss *and requested limited discovery*. *Id.* at 33. *Pentzer* also cited approvingly *Williams v. Cigna Financial Advisors, Inc.*, 56 F.3d 656 (5th Cir. 1995), which found no waiver when the moving party removed to federal court, moved to dismiss and to stay discovery, answered the complaint, filed a counterclaim, and exchanged Rule 26 discovery. *See id.* at 661-62; *see also Pentzer*, 252 F.3d at 33 (summarizing *Williams*). This is an easier case. Removal, filing a counterclaim, and seeking discovery is at least arguably inconsistent with a desire to arbitrate. Cultural Care, by contrast, sought no affirmative relief. It only moved to dismiss the complaint (largely on jurisdictional grounds) and moved to strike improper consents-to-sue. Both these motions and its motion to compel arbitration are consistent with the view that the district court below is the wrong forum to hear the case.

*Pentzer* is no outlier. This Court has long held that anyone claiming that a party asserting claiming waiver faces a "heavy" burden if the "answer, in its special defense, served notice on plaintiff of the arbitration defense." *Hilti*, 392 F.2d at 371. Other circuits have affirmed that "the earliest point at which [a party can waive the

right to arbitrate] may be found is when the other party files an answer on the merits." *Chatham Shipping Co. v. Fertex S. S. Corp.*, 352 F.2d 291, 293 (2d Cir. 1965) (Friendly, J.); *see, e.g.*, *Sharif v. Wellness Int'l Network, Ltd.*, 376 F.3d 720, 726 (7th Cir. 2004) ("[I]t is well-established that a party does not waive its right to arbitrate merely by filing a motion to dismiss.") (collecting authorities).

The principal case on which the district court relied for its waiver analysis, *Forby v. One Technologies, L.P.*, 909 F.3d 780 (5th Cir. 2018) (*cited* Add.12), held that moving to dismiss on the merits constitutes a per se waiver of an arbitration defense. *Id.* at 784 ("[M]oving to dismiss … demonstrated a desire to resolve the dispute in litigation rather than arbitration."). That out-of-circuit decision is flatly inconsistent with *Pentzer*, *Hilti*, and the other above cases. The district court was simply applying the wrong circuit's law when it denied the motion.

Finding a waiver based on Cultural Care's filings would also discriminate against arbitration in violation of the FAA. Again, an arbitration provision is just a category of forum-selection clause, and is thus subject to the same waiver test. *See, e.g.*, *Morgan*, 596 U.S. at 419. In this Circuit, "[a] motion to dismiss based on a forum-selection clause may be raised at any time in the proceedings before disposition on the merits." *Claudio-De Leon v. Sistema Universitario Ana G. Mendez*, 775 F.3d 41, 49 (1st Cir. 2014) (citation omitted); *see Yavuz v. 61 MM, Ltd.*, 576 F.3d 1166, 1173 (10th Cir. 2009) ("Unlike objections to venue or personal

jurisdiction, an objection on forum non conveniens grounds is not waived by a defendant failing to raise the issue in its first responsive pleading.").

*Claudio-De Leon* "easily dispensed with" an argument that a party had waived the right to invoke a forum-selection clause when "discovery was well under way, significant resources had already been expended, and substantive and dispositive motions were filed," and the moving party had "'test[ed] the waters' of federal court 'before invoking … the forum selection clause.'" 775 F.3d at 49 (brackets in original) ("[I]f [the plaintiffs] wanted to avoid any seeming unfairness, they should have filed their suit in the proper forum to begin with."). The district court's suggestion that Cultural Care waived the right to arbitrate by filing a motion to dismiss that was partly "on the merits" cannot be squared with *Claudio-De Leon*. Add.12 (quoting *Forby*, 909 F.3d at 784).[10]

Given that Cultural Care's motion to dismiss cannot be a waiver, its appeal of the district court's denial of that motion cannot be either. Cultural Care contended at the time that this Court had interlocutory jurisdiction over its appeal of the order denying dismissal "for lack of subject matter jurisdiction" based on "derivative sovereign immunity." *Morales Posada*, 66 F.4th at 351. There is nothing

---

[10] A different rule might apply for arbitration without constituting discrimination if, say, a party takes "advantage of judicial discovery procedures not available in arbitration." *Restoration Pres. Masonry*, 325 F.3d at 61 (citation omitted). But here, Cultural Care sought no relief unavailable in, or inconsistent with, arbitration.

inconsistent in Cultural Care's prior argument that the district court lacked subject matter jurisdiction and its present argument that the court should compel arbitration. The upshot of both is the same: the court below is the wrong forum. The district court did not dispute this point but mischaracterized Cultural Care's derivative sovereign immunity arguments as a merits defense, Add.11 n.3, even though Cultural Care has always maintained that this defense was jurisdictional, *see* A99. Last, Cultural Care cannot be faulted for not moving to compel arbitration while the appeal was pending, as its notice of appeal automatically stayed district court proceedings. A173; *see, e.g.*, *Marie*, 402 F.3d at 15-16 (party did not waive arbitration provision when it failed to move to compel arbitration during EEOC proceeding, because there was no opportunity to bring such a motion).

The court also noted that Cultural Care "filed an Opposition to Conditional Class Certification" and "a Motion to Strike the Consents to Sue." Add.11. But these filings did not constitute an intentional waiver, for three reasons.

*First*, both filings were triggered by *Plaintiffs'* actions, and "waiver may not be inferred from … attempts to meet all issues raised in litigation between it and another party to the agreement." *Germany v. River Terminal Ry.*, 477 F.2d 546, 547 (6th Cir. 1973) (per curiam).

*Second*, these filings are not inconsistent with an intention to arbitrate against either Plaintiffs or the opt-ins and conditional class. There is no waiver as to

Plaintiffs because these filings did not seek to dispose of Plaintiffs' claims at all; they just took the position that Plaintiffs' "claims were individual and could not" proceed on a class basis. *Donelson v. Ameriprise Fin. Servs., Inc.*, 999 F.3d 1080, 1088 (8th Cir. 2021) (motion to strike class-action allegations does not waive the right to arbitrate). Nor do these filings constitute waiver of the right to arbitrate against the opt-ins and conditional class. "[I]t would have been impossible in practice to compel arbitration" against these third parties until the court ruled that the opt-ins were properly joined and the class could be conditionally certified. *Gutierrez v. Wells Fargo Bank, NA*, 889 F.3d 1230, 1238 (11th Cir. 2018). For that reason, courts routinely rule that "the earliest time to move to compel arbitration is after class certification." *B & R Supermarket, Inc. v. Visa Inc.*, 2021 WL 4408167, *4 (E.D.N.Y. Sept. 27, 2021) (citation and quotation marks omitted) (collecting more than a dozen cases). This is an even easier case than *Donelson*, *Gutierrez*, and *B & R*: Cultural Care opposed only *conditional* certification under the FLSA and joinder of the opt-ins on "ripe[ness]" grounds; it did not seek final relief on these issues. A109; *see* A134 (opt-ins should be struck "unless and until such potential opt-ins are provided with appropriate Court-approved notice").

*Third*, treating these filings as a waiver of arbitration rights would create a Catch-22. Had Cultural Care consented to conditional certification and not objected

to the consents-to-sue, Plaintiffs would have argued that Cultural Care had implicitly consented to litigating against these parties.

Finally, the district court's suggestion that Cultural Care passed on "ample opportunit[ies] to raise an arbitration defense" is just not true. Add.12. Cultural Care had no clear opportunity to raise and resolve its arbitration defense until after its motion to dismiss challenging the court's subject matter jurisdiction was resolved. When that defense was resolved on appeal, Cultural Care promptly informed Plaintiffs that it intended to compel arbitration, asserted this defense in its answer, and negotiated a briefing schedule with Plaintiffs. A202, A238, A282-83. Cultural Care cannot be said to have clearly, and intentionally, given up its right to arbitrate when it could not have been assured of a decision on the motion any sooner.

## CONCLUSION

The order denying Cultural Care's motion to compel arbitration should be reversed.

Dated:  May 17, 2024

Respectfully submitted,

Harvey J. Wolkoff
Aliki Sofis
Alexander S. del Nido
Alex H. Loomis
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
111 Huntington Ave, Suite 520
Boston, MA 02199
(617) 712-7100
harveywolkoff@quinnemanuel.com
alikisofis@quinnemanuel.com
alexdelnido@quinnemanuel.com
alexloomis@quinnemanuel.com

/s/ William B. Adams
William B. Adams
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000
williamadams@quinnemanuel.com

*Counsel for Defendant-Appellant Cultural Care, Inc.*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(g)

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel certifies that this document complies as follows:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,616 words (based on the Microsoft Word word-count function), excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(b)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word in Times New Roman, 14-point type.

Dated: May 17, 2024                    */s/ William B. Adams*
                                        William B. Adams

## **CERTIFICATE OF SERVICE**

I hereby certify that, on May 17, 2024, I served the foregoing Brief on counsel

for Plaintiffs-Appellees via CM/ECF.

Dated: May 17, 2024          */s/ William B. Adams*
                              William B. Adams

# ADDENDUM

## TABLE OF CONTENTS

| ECF No. | Description (Date Filed) | Page |
|---------|--------------------------|------|
| 399 | Memorandum & Order Denying Defendant Cultural Care, Inc.'s Motion To Compel Arbitration | Add.1 |
| 310-2 | Exhibit B To The Declaration Of Natalie Jordan: Amanda Sarmiento Ferreira, dated November 20, 2017 (Aug. 18, 2023) | Add.19 |

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KAREN MORALES POSADA, AMANDA SARMENTO FERREIRA GUIMARAES, WILLIANA ROCHA, | * * * * |
| Plaintiffs, | * * |
| v. | * * Civil Action No. 1:20-cv-11862-IT |
| CULTURAL CARE, INC., | * * * |
| Defendant. | * |

MEMORANDUM & ORDER

February 28, 2024

TALWANI, D.J.

Plaintiffs Karen Morales Posada, Amanda Sarmento Ferreira Guimaraes, Williana Rocha, and Sara Barrientos assert against Cultural Care, Inc. ("Cultural Care Inc."), an au pair agency: claims on their own behalf and on behalf of similarly situated au pairs who have opted in to this litigation for violations of the federal Fair Labor Standards Act; and claims on their own behalf and on behalf of putative classes and subclasses for violations of various state laws. Cultural Care Inc. has now moved to compel the named Plaintiffs and all opt-in Plaintiffs to arbitration and for other or alternative relief, based on two agreements. Motion to Compel Arbitration [Doc. No. 309].

For the reasons set forth herein, to the extent arbitration is sought based on a 2023 agreement between individual au pairs and Cultural Care Inc., the motion is DENIED without prejudice where Cultural Care Inc. has not identified any named or opt-in Plaintiffs who signed the 2023 agreement. To the extent arbitration is sought based on a contract signed by the Plaintiffs and another party, International Care, Ltd., the motion is DENIED where Cultural Care

Add.1

Inc. has waived any right to enforce that arbitration provision, and in any event may not enforce it either as a third-party beneficiary or under the doctrine of equitable estoppel.

## I.  Background

### A.  *The Original and Amended Complaints and the First Motion to Dismiss*

On October 15, 2020, Karen Morales Posada filed the original <u>Complaint</u> [Doc. No. 1] in this action. On December 24, 2020, Cultural Care Inc. filed its first <u>Motion to Dismiss</u> [Doc. No. 11]. Shortly thereafter, on January 14, 2021, Morales Posada, joined by Amanda Sarmento Ferreira Guimaraes and Williana Rocha, filed an <u>Amended Complaint</u> [Doc. No. 23], and the court denied the first <u>Motion to Dismiss</u> as moot [Doc. No. 25].

### B.  *Temporary Stay of Discovery and the Commencement of Opt-In Filings*

The parties subsequently filed a join motion seeking, <u>inter alia</u>, a deadline for Plaintiffs to file a second amended complaint and a temporary stay of discovery, Joint Motion [Doc. No. 29], which the court allowed, Elec. Order [Doc. No. 30]. Beginning February 3, 2021, Plaintiffs began filing opt-in Plaintiffs' <u>Notices of Consent to Sue</u>. <u>See</u>, <u>e.g.</u>, Notices of Consent to Sue [Doc. Nos. 32-42].

### C.  *The Second Amended Complaint*

On February 19, 2021, Morales Posada, Ferreira Guimaraes, Rocha, and Sara Barrientos filed the operative <u>Second Amended Complaint</u> [Doc. No. 43] alleging that Cultural Care Inc. is a U.S.-based au pair agency that sponsors foreign citizens' entry to this country, thereby allowing them to acquire the J-1 visas they need in order to work as au pairs in the United States. <u>Id.</u> ¶ 13. Plaintiffs alleged that they are citizens of other countries who provided in-home childcare services in the United States as au pairs employed by Cultural Care Inc. <u>Id.</u> ¶¶ 31-83. They alleged further that once they and other au pairs entered the United States, Cultural Care

2

**Add.2**

Inc. controlled their placements with host families, the communications with host families regarding au pairs' compensation, id. ¶¶ 16-23, and communications with the au pairs regarding their maximum work hours and job duties, among other things, id. ¶¶ 24-26.

Plaintiffs brought claims under California, New York, New Jersey, Illinois, and Washington's wage and hour, unfair business practices and/or deceptive trade practices laws, and under the federal Fair Labor Standards Act ("FLSA"). They sought to recover unpaid wages (including minimum wages and overtime wages), liquidated damages, statutory penalties, and attorneys' fees and costs on behalf of themselves and other au pairs employed by Cultural Care Inc. Id. ¶ 4, Prayer for Relief.

D.   *Cultural Care Inc.'s Second Motion to Dismiss*

Cultural Care Inc. filed a second Motion to Dismiss [Doc. No. 66] on March 22, 2021. Cultural Care Inc. argued that it was entitled to derivative sovereign immunity (asserted via Federal Rule of Civil Procedure 12(b)(1)) as to all claims. It argued further that the wage and employment laws allegedly violated are preempted by federal regulations (asserted via Rule 12(b)(6)), and that Plaintiffs failed to allege facts establishing either that Cultural Care Inc. "employs" au pairs or that Cultural Care Inc. engaged in any deceptive practices (both also asserted via Rule 12(b)(6)). Def's Mem. 2-3 [Doc. No. 67]. Plaintiffs opposed the motion. Pls. Opp. to MTD [Doc. No. 78].

E.   *Motion for and Opposition to Conditional Class Certification*

While the motion to dismiss was pending, Plaintiffs filed a Motion to Conditionally Certify the Class [Doc. No. 98]. Cultural Care Inc. filed an Opposition [Doc. No. 112] on June 9, 2021. Cultural Care Inc. disputed the factual basis for Plaintiffs' claims, including whether Cultural Care Inc. maintains a policy of failing to pay overtime or failing to properly instruct

**Add.3**

host families on stipend amounts. Memorandum 9-14 [Doc. No. 112]. Cultural Care Inc. also objected to Plaintiffs' proposed notice to class and argued that if notice was given, it should be amended to say that individuals who opt-in "may be required to submit documents and testify under oath at a deposition, hearing, or trial, which will take place in Boston, Massachusetts." Id. at 18-19.

      F.   *Motion to Strike Pre-Certification Consents to Sue*

Also on June 9, 2021, Cultural Care Inc. filed a Motion to Strike the Pre-Certification Consents to Sue [Doc. No. 114], based in part on Plaintiffs' purported failure to inform potential opt-in class members of their need to "produce documents, testify at a deposition, and even travel to the United States for testimony at trial" during the litigation. Memorandum 8 [Doc. No. 115]. Plaintiffs opposed that motion. Pl.'s Oppo. to Motion to Strike [Doc. No. 122].

      G.   *The Court's Order on the Second Motion to Dismiss, Cultural Care Inc.'s Notice of Appeal, and the Stay of Proceedings*

On August 13, 2021, the court granted Cultural Care Inc.'s Motion to Dismiss as to part of Count 14, dismissing Plaintiffs' claim that Cultural Care Inc. had violated Washington and Connecticut consumer protection laws. Mem. 21-22 [Doc. No. 137]. The court otherwise denied the motion, allowing Plaintiffs to proceed on Counts 1 through 13 and the remainder of Count 14.

Cultural Care Inc. sought an interlocutory appeal of the court's Order "and each and every part thereof." Notice of Appeal [Doc. No. 142]. Cultural Care Inc. also sought a stay in this court. Motion to Stay [Doc. No. 156]. Plaintiffs stipulated to the stay after the First Circuit denied their request for summary disposition and set merits briefing, and Cultural Care Inc. agreed to toll the FLSA statute of limitations for putative collective action class members until the First Circuit resolved Defendant's appeal, Stipulation [Doc. No. 161], and the court entered

**Add.4**

the requested stay, Order Granting Joint Motion for Entry of Stay and Tolling of FLSA Statute of Limitations [Doc. No. 162].

    H.  *Proceedings at the First Circuit*

At the First Circuit, Cultural Care Inc. argued that the district court had jurisdiction over Plaintiffs' FLSA claims under 28 U.S.C. § 1331 and over Plaintiffs' state law claims under 28 U.S.C. § 1367(c); that the First Circuit had jurisdiction to review the denial of Cultural Care Inc.'s motion to dismiss state law claims based on derivative sovereign immunity under the collateral order doctrine; and that the First Circuit had pendent appellate jurisdiction to review the denial of the motion to dismiss state law claims based on preemption and to dismiss the FLSA claims for failure to state a claim. Br. for Appellant, No. 1:20-cv-11862-IT, 2022 WL 159237, at *3-4 (1st Cir. Jan. 10, 2022).

On April 26, 2023, the First Circuit issued an opinion affirming the court's denial of Cultural Care Inc.'s <u>Yearsley</u> claim of derivative sovereign immunity. <u>Posada v. Cultural Care, Inc.</u>, 66 F.4th 348 (1st Cir. 2023). The Court noted that Cultural Care Inc. also "challenge[d] the order's rejection of the portions of the motion to dismiss that were based on grounds independent of the claim of immunity," <u>id.</u> at 350, but declined to assert pendent appellate jurisdiction and dismissed those portions of the appeal for lack of appellate jurisdiction, <u>id.</u> at 350, 364.

    I.  *The Lifting of the Stay, the Court's Orders on Pending Motions, and Cultural Care Inc.'s Answer*

On June 9, 2023, the First Circuit issued its mandate returning the case to this court, thereby ending the agreed-upon tolling of the FLSA statute of limitations. Mandate [Doc. No. 260]; Order Granting Joint Motion for Entry of Stay and Tolling of FLSA Statute of Limitations [Doc. No. 162]. On June 20, 2023, this court lifted the stay, <u>Elec. Order</u> [Doc. No. 262] and issued its <u>Memorandum and Order</u> [Doc. No. 263] denying Cultural Care Inc.'s <u>Motion to Strike</u>

**Add.5**

Pre-Certification Consents and granting Plaintiffs' Motion to Certify a Collective Action and Issue Notice to the Proposed Collective. The court agreed in part with Cultural Care Inc.'s notice to opt-ins, requiring Plaintiffs to amend the proposed notice to state that "[i]ndividuals who consent to join this action may be required to submit documents and testify under oath at a deposition, hearing, or trial" and to make clear that Cultural Care Inc. disputed Plaintiffs' claims. Id. at 22.

On July 7, 2023, Cultural Care Inc. filed its Answer [Doc. No. 274] to Plaintiffs' Second Amended Complaint [Doc. No. 43]. Cultural Care Inc. asserted as one of forty-one Affirmative Defenses that Plaintiffs' "claims and purported class action are barred by their arbitration agreements[.]" Answer 32 [Doc. No. 274].

    J.   *Motion to Compel Arbitration*

On August 18, 2023, Cultural Care Inc. filed the pending Motion to Compel Arbitration [Doc. No. 309]. Cultural Care Inc. seeks to compel arbitration based on two contracts, as discussed further below.

The parties stipulated to limited discovery regarding the motion to compel arbitration, and the court so ordered. Joint Stipulation and Order [Doc. No. 325].

Following limited discovery, Plaintiffs have opposed the motion on numerous grounds. Pl.'s Oppo. [Doc. No. 368]. They also report that, as of that filing, 7,809 individuals have opted into the case to assert FLSA claims. Id. (citing docket).

**II.    Standard of Review**

To succeed on its motion to compel arbitration, the movant "must demonstrate (1) that a valid agreement to arbitrate exists, (2) that they are entitled to invoke the arbitration clause, (3)

that the other party is bound by that clause, and (4) that the claim asserted comes within the clause's scope. Bossé v. N.Y. Life Ins. Co., 992 F.3d 20, 27 (1st Cir. 2021) (cleaned up).

Section Two of the Federal Arbitration Act provides that a "written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy . . . arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. However, the Federal Arbitration Act's "'policy favoring arbitration' does not authorize federal courts to invent special, arbitration-preferring procedural rules." Morgan v. Sundance, Inc., 596 U.S. 411, 418 (2022). Accordingly, "[i]f an ordinary procedural rule—whether of waiver or forfeiture or what-have-you—would counsel against enforcement of an arbitration contract, then so be it. The federal policy is about treating arbitration contracts like all others, not about fostering arbitration." Id.

As to waiver, the First Circuit has "recognized that the very rationale for arbitration may be undercut if a party is permitted to pursue a claim through the courts and then later claim a right to arbitration." In re Citigroup, Inc., 376 F.3d 23, 27 (1st Cir. 2004) (cleaned up). In determining whether waiver has occurred, courts employ a non-exclusive, factor-based test. These factors include:

> (1) Whether the parties participated in a lawsuit or took other action inconsistent with arbitration; (2) whether the litigation machinery has been substantially invoked and the parties are well into preparation of a lawsuit by the time an intention to arbitrate is communicated; (3) whether there has been a long delay and trial is near at hand; (4) whether the party seeking to compel arbitration has invoked the jurisdiction of the court by filing a counterclaim; (5) whether discovery not available in arbitration has occurred; and, (6) whether the party asserting waiver has suffered prejudice.

FPE Found. v. Cohen, 801 F.3d 25, 29 (1st Cir. 2015) (internal quotation marks and brackets omitted). All told, "[t]here is no bright-line rule for a waiver of arbitral rights, and each case is to

**Add.7**

be judged on its particular facts." Hayes v. Conduent Com. Sols., LLC, No. 21-cv-11545, 2022

WL 1104622, at *6 (D. Mass. Apr. 13, 2022).

### III.    The 2023 Contract

Cultural Care Inc. states that beginning in January 2023, au pairs were required to sign an

agreement with Cultural Care Inc. (the "2023 Contract"). Jordan Decl. ¶ 12 [Doc. No. 310]. The

2023 Contract states that it is an agreement between "Cultural Care, Inc., located at One

Education Street, Cambridge, MA 02141 . . . and the individual named below"). Jordan Decl.,

Ex. E at 1[Doc. No. 310-5]. The copy of the 2023 Contract filed with the court has no individual

named and is unsigned. See id. at 7.

The 2023 Contract also contains an arbitration provision stating in relevant part:

> In connection with any claim, dispute, or proceeding arising out of or relating in
> any manner to this Agreement or my relationship with [Cultural Care Inc.], or any
> dispute or claim between me and [Cultural Care Inc.] whether in contract, tort, or
> otherwise, or at law or in equity, whether or not related to this Agreement, the
> parties hereby mutually agree to submit to mandatory, final, and binding
> arbitration on an individual basis.

Id. ¶ 27. Natalie Jordan, the Senior Vice President of Cultural Care Inc. averred that "[e]very au

pair selected to participate in the Program and beginning their placement with a host family in

the United States in 2023 has signed an identical" 2023 Contract. Jordan Decl. ¶12 [Doc. No.

310].

On its face, the 2023 Contract does not apply to the named Plaintiffs, who all began their

employment well before 2023. Plaintiffs note further that Cultural Care Inc. has not submitted

the 2023 Contract for any of the opt-in Plaintiffs, see Pl.'s Oppo. at 2 n.1 [Doc. No. 368]. In

response, Cultural Care Inc. asserts only that "[t]hose Contracts expressly delegate all issues of

arbitrability to the arbitrator, and explicitly provide that [Cultural Care Inc.] can enforce them as

a party" and that Cultural Care Inc. "cannot have waived its rights to enforce these Contracts

given that they did not exist before [2023]." Reply at 5 n.8 [Doc. No. 382]. But while Cultural

Care Inc. concludes that the court therefore should grant the motion to compel "as to any opt-ins

who began in 2023," id., Cultural Care Inc. still has not identified any such opt-in Plaintiff who

has joined the action. Without an identified opt-in Plaintiff, Cultural Care Inc. is seeking an

advisory opinion only and the court has no jurisdiction to address the matter in this posture.

Accordingly, the motion to compel is DENIED without prejudice as to the 2023 Contract.

## IV.    The International Care Contract

Cultural Care Inc. also asserts that between January 1, 2018, through December 31, 2022,

all au pairs selected for sponsorship by Cultural Care Inc., including the named Plaintiffs, signed

a contract (the "International Care Contract") with International Care, Ltd. ("International Care")

setting forth various terms and conditions of their participation in the au pair program. Jordan

Decl. ¶¶ 6-7 [Doc. No. 310].[1] International Care is a Swiss company that is a "separate and

distinct company from [Cultural Care Inc.]." 2023 Contract ¶ 6 [Doc. No. 310-5]; see Mem. ISO

Motion at 10 [Doc. No. 312]. International Care "provided [au pairs with] recruiting, screening,

and other pre-departure services." 2023 Contract ¶ 6 [Doc. No. 310-5]; Jordan Decl. ¶ 4 [Doc.

No. 310].

The International Care Agreement begins by defining "Cultural Care" as the "registered

business name of International Care, Ltd.," and further specifies that the references to "CC" in

---

[1] Plaintiffs assert that Cultural Care Inc. has not met its burden to show that the named Plaintiffs
signed the International Care Contract. Pl.'s Oppo. at 18 [Doc. No. 368]. But Plaintiffs also
acknowledge that Cultural Care Inc. has provided signed copies of the identical Contract for each
of the named Plaintiffs, see International Care Contracts [Doc. Nos. 310-1 (Morales Posada
Contract); 310-2 (Guimaraes Contract); 310-3 (Rocha Contract); 310-4 (Barrientos Contract)];
and Plaintiffs have not offered any contrary evidence or evidence that those documents are not
authentic. Accordingly, for purposes of this motion, the court assumes that the named Plaintiffs
have signed the International Care Contract.

that agreement are references to International Care "and its successors and assignees." International Care Contract [Doc. No. 310-1]. The International Care Contract contains further provisions relevant to the pending motion.

First, the arbitration clause of the International Care Contract provides:

This Agreement shall take effect as a sealed instrument under and shall be governed by the laws of Switzerland. In the event of any claim, dispute, or proceeding arising out of the relationship of me and [International Care and its successors and assigns], or any claim which in contract, tort, or otherwise at law or in equity arises between the parties, whether or not related to this Agreement, the parties submit and consent to the exclusive jurisdiction and venue of the arbitrational tribunals of Switzerland.

Id. ¶ 15.

Second, Paragraph 13 of the Contract states that "[t]his agreement is made between me and [International Care and its successors and assigns] . . . . Any disputes will be settled between me and [International Care and its successors and assigns] or any legal entity bound to represent us and *no other third party*." (emphasis added). Id. ¶ 13.

Cultural Care Inc. contends that it has the right to enforce this contract.[2] Plaintiffs oppose the motion to compel on multiple grounds. The court need only address some of these arguments.

---

[2] Cultural Care Inc. urges the court to adopt the reasoning in Kudlacz v. Cultural Care, Inc., et al., No. CGC-20-584567 (Cal. Sup. Ct. Oct. 27, 2023), an unreported California Superior court case reprinted as Ex. 2 to Hood Decl. [Doc. No. 369-2], on the issue of whether Cultural Care Inc. may enforce the International Care Contract. Reply at 1 [Doc. No. 382]. But Kudlacz is distinguishable on critical facts. First, International Care was a defendant in Kudlacz but is not a party here. Second, no motion to dismiss was ever filed in Kudlacz, let alone an interlocutory appeal of such a motion as has occurred here. And third, Plaintiffs in this case make independent legal arguments that were not raised in the Kudlacz litigation: the Kudlacz Plaintiffs "d[id] not take issue with whether Cultural Care [Inc.] can compel arbitration even though [International Care] is the signatory defendant to the agreements." Kudlacz, Ex. 2 to Hood Decl. [Doc. No. 369-2] at 8.

**Add.10**

A. *Cultural Care Inc. Has Waived Any Right to Arbitrate Pursuant to the International Care Contracts*

The court finds the procedural history here weighs strongly against allowing Cultural Care Inc. to pursue arbitration. As detailed above, <u>supra</u> Section I, Cultural Care Inc. has "substantially invoked" the litigation machinery in this case. It fully litigated a <u>Motion to Dismiss</u>, claiming not only that it was entitled to derivative sovereign immunity, but also that the claims were preempted and that the Second Amended Complaint failed to state a claim.[3] In its interlocutory appeal, it made no mention of arbitration, instead asserting that the district court and First Circuit had jurisdiction to decide the issues presented, and appealed to the First Circuit to address not only the immunity question but also Cultural Care Inc.'s 12(b)(6) arguments. Cultural Care Inc. also filed an <u>Opposition to Conditional Class Certification</u>, in which it again put forth arguments on the merits of Plaintiffs' claims and objected to Plaintiffs' proposed notice for failing to tell potential opt-ins that they would have to travel to Boston, Massachusetts, for the litigation—without once raising the issue of arbitration. And Cultural Care Inc. has also filed a <u>Motion to Strike the Consents to Sue</u>, and argued there that putative class members would be unprepared to participate in active *litigation*—not arbitration—including depositions and trial.

These actions, taken together, are a far cry from "merely" filing a motion to dismiss, <u>see</u> Mem. ISO Motion at 16 [Doc. No. 312] (citing <u>Herrera Gollo v. Seaborne P.R., LLC</u>, No. 15-1771, 2017 WL 657430, at *4 (D.P.R. Feb. 17, 2017)); <u>cf.</u> <u>Creative Sols. Grp., Inc. v. Pentzer</u>

---

[3] Cultural Care disputes that its <u>Motion to Dismiss</u> reached the merits of the Plaintiffs' claims. But Sections III and IV of its <u>Memorandum</u> [Doc. No. 67] in support of that motion directly addressed whether Plaintiffs sufficiently alleged facts demonstrating Cultural Care was their employer, <u>id.</u> at 3-4, 28-29—the issue at the heart of the case—and facts showing Cultural Care violated relevant law, <u>id.</u> at 29-30. And while Cultural Care now asserts that its <u>Yearsley</u> defense was purely jurisdictional, it argued at the motion-to-dismiss stage that the doctrine's applicability turned on the *conduct alleged* by the Plaintiffs and "shielded [Cultural Care] from the *entirety* of this suit." <u>Id.</u> at 2 (emphasis added).

**Add.11**

Corp., 252 F.3d 28, 30 (defendant filed motion to compel arbitration two months after filing

motion to dismiss, before district court had ruled on that motion). Both sides—and two courts—

have expended time and resources addressing arguments brought by Cultural Care Inc. on

numerous aspects of this case. Cultural Care Inc. has had ample opportunity to raise an

arbitration defense yet has waited until after it attempted a "full-throated attempt to win this case

on the merits in federal court" at both the district and appellate levels, see Forby v. One

Technologies, L.P., 909 F.3d 780, 784 (5th Cir. 2018).

The court therefore finds that Cultural Care Inc. has waived any potential right to

arbitrate pursuant to the International Care Contract. See In re Citigroup, 376 F.3d at 29 ("Given

the complexity of the litigation, knowing full well the wide-ranging implications for all parties

involved . . . , [Defendant] should have acted in a prompt manner to assert its right to arbitrate

claims in issue.").

B.  *Cultural Care Inc. May Not Enforce the International Care Contract*

Even if Cultural Care Inc. had not waived its right to arbitrate, as a nonsignatory, it may

not enforce the International Care Contract's arbitration clause.

As a threshold matter, Cultural Care Inc. asserts that the enforceability question may be

resolved only by an arbitrator and is not properly before the court. That is incorrect. In First

Options of Chi., Inc. v. Kaplan, the Supreme Court specified that "[c]ourts should not assume

that the parties agreed to arbitrate arbitrability unless there is 'clear and unmistakable' evidence

that they did so." 514 U.S. 938, 944 (1995) (cleaned up). Thus, "absent a valid provision

specifically committing such disputes to an arbitrator," the issues of "enforceability or

applicability [of arbitration] to the dispute" are questions for the court to decide. Granite Rock

Co. v. Int'l Bhd. of Teamsters, 561 U.S. 287, 299 (2010); accord Henry Schein, Inc. v. Archer

**Add.12**

and White Sales, Inc., 139 S.Ct. 524, 527 (2019) ("[T]he question of who decides arbitrability is itself a question of contract.").

The International Care Contract's arbitration clause does not contain a "clear and unmistakable" intent to delegate threshold questions of arbitrability to the arbitrator rather than the court. The arbitration clause covers disputes that "arise[] out of the relationship of [the au pair] and [International Care]," and legal or equitable claims that "arise between the parties." International Care Contract ¶ 15 [Doc. No. 310-1]. The arbitration clause makes no mention of the arbitrator resolving disputes about whether an entity is itself a party for the purposes of enforcement: It necessarily follows that the provision is only triggered once the court determines that these parties have agreed to arbitration.

The court therefore considers whether Plaintiffs agreed to resolve disputes with Cultural Care Inc. through arbitration. In so doing, the court applies basic principles of state contract law to determine the issue of enforceability. See Arthur Andersen LLP v. Carlisle, 556 U.S. 624, 630-631 ("State law, therefore, is applicable to determine which contracts are binding under [9 U.S.C.] § 2 and enforceable under [9 U.S.C.] § 3 if that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally.") (cleaned up); Landry v. Transworld Sys., Inc., 485 Mass. 334, 337, 149 N.E.2d 781 (Mass. 2020) ("Our interpretation of the arbitration provision in question is guided by decisions interpreting the Federal Arbitration Act, and by State contract law pertaining to enforcement of a contract by nonsignatories.").[4]

---

[4] The parties agree that state law governs these threshold inquiries. Plaintiffs assert that if the court determines Cultural Care Inc. may enforce the arbitration provision under state law, then Swiss choice-of-law must also be applied to the enforceability question. Pl.'s Oppo. at 15-16 [Doc. No. 368]. Because the court does not find that Cultural Care Inc. may enforce the arbitration provision under state law, see infra, it need not reach the disputed issue whether Swiss law would permit Cultural Care Inc. to enforce the International Care Contract as a nonsignatory. The court notes, however, that the issue has been briefed and preserved by both parties.

**Add.13**

Cultural Care Inc., a nonsignatory to the International Care Contract, argues that it may enforce the contract as a third-party beneficiary or through the doctrine of equitable estoppel. The court considers each of these avenues in turn.

       1.   Third-Party Beneficiary

Third-party beneficiary status is "an exception to the general rule that a contract does not grant enforceable rights to nonsignatories." Hogan v. SPAR Grp., Inc., 914 F.3d 34, 39 (1st Cir. 2019) (internal quotation and citation omitted). "Under Massachusetts law, a nonsignatory seeking to enforce an arbitration agreement as a third-party beneficiary must point to 'clear[] and definite[]' evidence of the parties' intent that it benefit from the provision." Landry, 485 Mass. at 342; see Hogan, 914 F.3d at 39 (when a nonsignatory seeks to enforce an arbitration clause as a third-party beneficiary, they must demonstrate with "special clarity that the contracting parties intended to confer a benefit on [it]"). "In evaluating whether such 'special clarity' exists, a court should focus on the 'specific terms' of the agreement at issue, being mindful that it 'ought not to distort the clear intention of contracting parties or reach conclusions at odds with the unambiguous language of the contract.'" Hogan, 914 F.3d at 39 (citing EEOC v. Waffle House, Inc., 534 U.S. 279, 294 (2002)). Critically, "[f]or evidence of intent to include [a nonsignatory] as a third-party beneficiary to be considered 'clear and definite,' there must, at a minimum, be no ambiguity in the arbitration provision as to whether [the nonsignatory] could enforce it." Landry, 485 Mass. at 342; see also id. at 343 (direct reference to "agents" and "representatives" in the arbitration provision did not give rise to third-party beneficiary enforcement because such an interpretation was "by no means the only reasonable interpretation"); accord Steel-Rogers v. Glob. Life Scis. Sols. USA, LLC, 624 F. Supp. 3d 10, 17 (D. Mass. 2022) (defendant "not a

third-party beneficiary because it has not shown a total lack of ambiguity" in the arbitration clause).

Here, the arbitration provision does not even make an ambiguous reference that could be construed to include Cultural Care Inc. as a third-party beneficiary. By its terms, the International Care Contract does *not* grant third parties the right to arbitrate. The arbitration provision references International Care and its "successors and assigns" in one clause, and "the parties" in another. There is no express inclusion of affiliates, agents, beneficiaries, or any other category that might apply to Cultural Care Inc.

Hogan v. SPAR is also instructive on this issue. In that case, a staffing company engaged the plaintiff to provide services for a retail services provider. 914 F.3d at 36. The plaintiff and the staffing company entered into a contract (the "Master Agreement") to which the defendant retail services provider was not a signatory. Id. In considering whether the defendant could enforce a right to arbitrate as a third-party beneficiary, the First Circuit focused on the Master Agreement arbitration clause's language in isolation, without regard to whether the contract "confer[red] upon [the defendant] some benefit unrelated to arbitration." Id. at 40. The arbitration clause "specifically limit[ed] its applicability to 'the Parties.' It state[d] that: '[a]ny dispute between the Parties relating to this Master Agreement or otherwise arising out of their relationship under its terms . . . shall be determined by arbitration." Id. at 38 (emphasis in original). The court held that that language "limits [the arbitration clause's] applicability to the signatories by only covering disputes 'between the Parties,'" which made it "clear that it does not confer arbitration rights to [defendant] or any third party." Id. at 40.

The International Care Contract contains parallel language to the Hogan Master Agreement. Here, as there, the arbitration clause is limited to the "relationship of [the au pair]

**Add.15**

and [International Care[5]]" and disputes that arise "between the parties." International Care Contract ¶ 15 [Doc. No. 310-1]. The court therefore rejects Cultural Care Inc.'s perplexing assertion that <u>Hogan</u> is "inapposite" because it covered only disputes "between the Parties," given that the International Care Contract contains nearly identical limiting language. <u>See</u> Reply at 6 n.13 [Doc. No. 382]. Further, here, as in <u>Hogan</u>, the court's determination is reinforced by the mention of "affiliates" and the "Cultural Care staff in the United States" in other portions of the International Care Contract but not in the arbitration provision: "[G]iven 'the probable sophistication of the drafters of the agreement, . . . the omission of defendants from the arbitration clause must be regarded as purposeful.'" <u>See</u> 914 F.3d at 40 (quoting <u>Mowbray v. Moseley, Hallgarten, Estabrook & Weeden, Inc.</u>, 795 F.2d 1111, 1118 (1st Cir. 1986)).

For these reasons, the court rejects Cultural Care Inc.'s claim that it may enforce the International Care Contract's arbitration clause as a third-party beneficiary.

    2.  Equitable Estoppel

Under the doctrine of equitable estoppel, a nonsignatory may compel arbitration against a signatory where that signatory (1) "must rely on the terms of the written agreement in asserting its claims against the nonsignatory"; or (2) "raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more signatories to the contract." <u>Machado v. System4 LLC</u>, 471 Mass. 204, 211, 28 N.E. 3d 401 (Mass. 2015).

Cultural Care Inc. argues that the first prong of the equitable estoppel test is met here, because "a finder of fact cannot determine Plaintiffs' status [as employees] without referring to the contract[]. . . " Mem. ISO Motion at 12-13 [Doc. No. 312]. The court disagrees. The actions

---

[5] The reference to "CC" is indisputably a reference to International Care and its successors and assigns, <u>see</u> <u>supra</u> Section IV.

Plaintiffs allege established Cultural Care Inc. as their employer—and that serve as the crux of their claims—are not covered by the International Care Contract. The International Care Contract covers the au pairs' general conduct while participating in the program. The International Care Contract has no provisions identifying a stipend amount to be paid by Cultural Care Inc., setting or limiting overtime pay rates or specific hour requirements, articulating Cultural Care Inc.'s fee or cost structures, or specifying the nature of communications between Cultural Care Inc. and the au pairs' eventual host families.

The International Care Contract makes only two mentions of wage or hour-related concerns. First, it specifies that au pairs must "stay[] within the legal number of working hours per day and per week without exception." International Care Contract ¶ 3 [Doc. No. 310-1]. Plaintiffs do not contend they were forced to work outside of any legal hour maximum. Rather, they contend they were not paid for hours they legally worked. Second, the International Care Contract specifies that "[International Care] is not responsible for any financial disputes . . . with my host family." Id. ¶ 7. But Plaintiffs' financial dispute is not with their host families or International Care—it is with Cultural Care Inc. The thrust of Plaintiffs' allegations is that Cultural Care Inc. systematically misinformed host families regarding proper compensation; according to Plaintiffs, the onus is on Cultural Care Inc., not the families or International Care, to rectify the wage violations. Complaint ¶¶ 16-24 [Doc. No. 43]. Thus, is entirely possible that Plaintiffs' claims—which are all statutory in nature—could proceed without any reference to the International Care Contract. See Hogan, 914 F.3d at 42 ("Hogan's claims would exist even if the Master Agreement were declared void."); accord Ouadani v. TF Final Mile LLC, 876 F.3d 31, 40 (1st Cir. 2017) (no equitable estoppel because the plaintiff's "claims do not depend on the existence of a right guaranteed in the Agreement").

**Add.17**

As a result, the court finds that Cultural Care Inc. may not enforce the International Care Contract's arbitration clause pursuant to the doctrine of equitable estoppel.

**V.      Conclusion**

For the foregoing reasons, Cultural Care Inc.'s <u>Motion to Compel Arbitration</u> [Doc. No. 309] is DENIED as to the International Care Contract and DENIED without prejudice as to the 2023 Contract.[6]

IT IS SO ORDERED

February 28, 2024                        /s/        Indira Talwani

                                                 United States District Judge

---

[6] The court also declines to stay this action as to the California plaintiffs in favor of the <u>Kudlacz</u> litigation, <u>see</u> Mem. ISO Motion at 19-20 [Doc. No. 312], where <u>Kudlacz</u> brings California state-law Private Attorneys General Act (PAGA) claims alone and Plaintiffs in this action bring federal Fair Labor Standards Act claims and non-PAGA state claims.

**Add.18**

*Au Pair reference number*

## Cultural Care Au Pair

# Agreement

*Cultural Care (registered business name of International Care, Ltd.), with registration number CH-1003.023.491-6, having its registered address at Haldenstrasse 4, 6006 Lucerne, Switzerland, together with its successors and assignees ("CC"), and the undersigned au pair,*

### Amanda Sarmento Ferreira Guimarães

(Please print full au pair name)

*with date of birth:* _____ *(Hereafter refered to as "I", "me" or "my"), for good and valuable consideration, understand and agree to the following terms and conditions (the "Agreement") relating to the au pair's participation in Cultural Care Au Pair au pair program (the "Program").*

1. In addition to the terms of this Agreement, I agree to abide by additional reasonable terms and conditions stipulated by CC during the Program, including the Extension program. If there is any confusion between this Agreement and the terms of any other contracts, agreements, or materials of any kind, the terms of this Agreement shall prevail.

2. I acknowledge that any materials I submit to Cultural Care will be used to make a suitable host family match for me and therefore agree that any submitted materials may be disclosed to prospective host families during the selection process, including my submitted medical forms.

3. I agree to comply with the Program regulations issued by the United States Department of State (22 CFR Part 62) ("Regulations"). I acknowledge receipt of a copy of the Regulations as they apply to me. I also understand that I must comply with CC's rules as outlined in this Agreement, the Au Pair Handbooks and other materials that CC has supplied to me. This includes staying within the legal number of working hours per day and week without exception. This also includes participation in all child safety and child development training and orientation sessions sponsored by CC. I will inform my Local Childcare Coordinator or CC if I encounter anything that does not comply with the Program regulations as outlined by the U.S. Department of State Regulations.

4. I agree to perform the child care responsibilities as outlined by CC and my host family to the best of my ability. I understand that providing childcare is my primary obligation in this Program and that any personal plans or activities will take secondary priority to caring for my host children. Should I be found to act in a way that puts my host children at risk or is inappropriate in any way, I understand that I will be removed from the Program immediately. I understand that my host family may ask me to respect a curfew and/or assign other reasonable restrictions designed to protect the safety and well-being of my host children. I agree to abide by such reasonable restrictions. I also understand that I may not post photos or personal information about my host family, host children, or host home on any web site, blog or the like without the express written consent of my host parents.

5. During my participation in the Program I will abide by all local, state and federal laws and other regulations. I understand that breaking these laws (such as shoplifting, driving under the influence of alcohol, drinking alcohol under the age of 21, possession, or use of illegal substances, etc.) shall be grounds for my immediate dismissal from the program and my return flight will be forfeited.

6. I understand that I may not use the family's automobile(s) for any reason without express permission from the host family and that any agreement to use the host family's automobile is strictly between the host family and me. I will not use the automobile unless the host family has obtained all of the mandatory automobile insurance coverage required under the laws of the state where the host family resides. I understand that if I have a car accident while using the car for personal use not related to my child care duties that I will be required to pay a deductible up to $500 US.

7. I agree to pay any personal expenses I incur while participating in the Program, including but not limited to, health expenses not covered by insurance, phone bills and/or car damages. CC is not responsible for any financial disputes I have with my host family such as outstanding money for educational component, weekly stipend, etc. I understand that I must settle all disputes directly with my host family prior to my departure from their home.

8. I understand that my Local Childcare Coordinator and the Cultural Care staff in the U.S. are my primary contacts during the Program, and are responsible for ensuring a positive and successful program year for me and my host family. I will notify the staff of CC in the U.S. in case of disagreement, misunderstanding or serious problems including but not limited to my health, safety, welfare, adjustment to my host family, school, culture or language, or misunderstandings or problems with my host family. I acknowledge that CC is solely responsible for choosing appropriate host families for me and I will not make attempts to obtain placements on my own after my arrival in the U.S. In situations where I am having problems with my host family, I agree to consult with and meet with my Local Childcare Coordinator and to follow CC's mediation guidelines as outlined in the Au Pair Handbook. I understand that it is CC's policy to try to resolve issues in the existing placement if possible before considering a new placement.

9. If CC determines that my placement within the host family will not continue, CC shall determine whether or not to pursue a new host family match for me. I understand that CC may not pursue a new host family for me due to safety concerns, a lack of positive recommendations or for other reasons relating to my suitability on the Program. I acknowledge that CC has sole discretion to pursue a new placement or not. Should CC decide to pursue a new placement, I understand that CC will use reasonable efforts for two weeks to find another host family for me. During such time, I shall continue to live with my current host family who, in its discretion, may request me to provide, or not to provide, any childcare services and I shall remain reachable by phone/email with CC at all times. If I do not perform childcare duties during the transition period (even if I am staying with a host family) I understand that I will not receive the weekly stipend. CC will make every effort to match me with appropriate host families. Should I reject these host families for reasons of geographical region, car/computer use or other non-essential reasons I understand that CC may opt to discontinue a search for replacement. I understand that CC cannot guarantee a new family placement for me within the two-week transition period and inability to be replaced will result in my early return to my home country. Notwithstanding the above, I further understand that the first month of any placement is a period of adjustment and therefore CC will not process any non-emergency transitions during this period.

10. I understand that CC has the exclusive right to determine my suitability for acceptance and for my continued participation in the Program. I understand that if CC determines that my emotional or physical state does not make me suitable for providing quality childcare, I will be removed from the Program. I also

Au Pair's signature for this page: *Amanda S.F. Guimarães*

**Add.19**

Date: __11/20/17__

Version SY16

understand that should I marry or become pregnant while on the Program I will also be removed from the Program. If my performance as an au pair and/or participation in the Program is deemed unsatisfactory by CC, I may be removed from the Program at the sole discretion of CC management. I understand that I may be terminated from the Program if I do not successfully complete the Program requirements and uphold Program expectations for reasons including, but not limited to, the following: leaving the host family without prior consent from CC; engaging in behavior that CC deems inappropriate during the Program duration, performance reasons including but not limited to breaking host family rules, neglectful or inappropriate behavior towards the children, etc.; non-participation in training, not fulfilling educational credit, non-attendance at monthly meetings, or if I in any way violate this Agreement. I further understand that should it be discovered that I have falsified or withheld critical information from my application materials including, but not limited to, health conditions, criminal history, educational documentation, childcare experience, etc. I may be terminated from the Program. Should I be terminated from the Program because of my actions including, but not limited to, those outlined above, I forfeit my return to my home country and must pay for this flight on my own.

11. I understand that the Program is designated as a full year program with the possibility to extend for a further six (6), nine (9) or twelve (12) months. I confirm receiving information about the optional Extended Insurance coverage, including a copy of the general conditions booklet. If I extend after my first program year, I will be contacted regarding the activation of Extended Insurance coverage for my extension term under a new policy. Should I voluntarily decide to return home before the regular end date of my program (including extension period) I understand that my flight will not be paid for by CC. The exception to this will be in cases of my own extreme illness or the extreme illness or a death in my immediate family. Should I terminate or be terminated from the Program for any reason as outlined in this agreement, such termination will result in the following:

a) I will forfeit the return ticket and I will be required to make my own arrangements to return to my home country at my own expense; and b) My CC insurance coverage will no longer be valid and no part of it refunded other than the additional month optional insurance; and c) My status will be reported to U.S. Immigration and my participation in the au pair program will be canceled. d) CC will not provide me with housing in the USA.

12. CC will arrange my flights from and to my home country, from a CC approved gateway. I am responsible for my own transportation and the cost involved to the specified departure gateway in my home country. My departure date to the US (Group Arrival Date), will be determined by my availability and my host family's request. Should I cancel either of the included flights once the ticket has been issued, I understand that I will then be held responsible for any penalties and costs relating to this cancellation. CC will determine my return date based on the end date of my program and my host family gateway will be my return gateway. Special requests may be considered, however additional fees may apply and these costs will be my responsibility. I agree to provide proof of medical insurance coverage, either purchased as additional month optional insurance through CC or as a comparable policy from a third party, in order for CC to book my return flight for a date later than the completion of my Program. I understand that CC cannot book my return flight for a date later than thirty (30) days after completion of my Program. I understand that CC will not arrange for my return flight in case that I do not successfully complete the Program (including completion of required educational component). In this case I shall be responsible for my own flight home.

13. This agreement is made between me and CC. In regards to confidentiality, CC agrees not to divulge medical or confidential information (with the exception of my submitted medical forms, and any accompanying documents) about me or my Program experience to any third party except in case of medical emergency, or in the event I am incapacitated for any reason. As a person of the age of majority I understand that this also includes my parents or family members as well as any partner or friends. Any disputes will be settled between me and CC or any legal entity bound to represent us and no other third party.

14. I agree to irrevocably, unconditionally, and fully remise, release and forever discharge CC and its affiliates; and said persons' respective officers, directors, successors, assigns, attorneys, insurance companies, agents, employees and affiliates, or others to the extent acting or purporting to act on the afore mentioned persons' behalf (all of said persons hereinafter, in the aggregate, being referred to as "Released Parties"), from any and all claims or causes of action which I have or may hereafter have, which arise out of illness, injury, damage or loss of any other kind to me or my property resulting from or during participation in the Program. This includes, without limitation, my performance of services for and involvement with the host family, regardless of how such illness, injury, damage or loss may arise. I further agree to indemnify and hold harmless the Released Parties from and against any losses, claims, damages or liabilities related to or arising out of my participation in the Program, including (without limitation) any illness, injury or damage to me, that my host family causes, that any third party causes, that I cause or to which I contribute, and any illness, injury or damage to my host family which I cause or to which I contribute.

15. This Agreement shall take effect as a sealed instrument under and shall be governed by the laws of Switzerland. In the event of any claim, dispute, or proceeding arising out of the relationship of me and CC, or any claim which in contract, tort, or otherwise at law or in equity arises between the parties, whether or not related to this Agreement, the parties submit and consent to the exclusive jurisdiction and venue of the arbitral tribunals of Switzerland.

16. My signature on this agreement indicates acceptance of this Agreement and is legally binding. No alterations to the terms of this agreement will be valid unless approved in writing by CC. If any provision of this agreement shall be deemed unenforceable, such paragraph shall be omitted and the remainder of the agreement shall be valid and enforceable to the fullest extent allowed by law.

*Amanda S.F. Guimarães*                                    11/20/2017

Au pair signature                                                      Date

Amanda Sarmento Ferreira Guimarães

Au pair name printed

*If au pair will not be of the legal age of majority in his/her home country at the time of anticipated departure to the USA, please include below signature of parent or legal guardian.*

Legal guardian signature                                         Date

Legal guardian name printed

# Add.20